ROBERT L. HUNTER AND MAE V. HUNTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5666–64. Filed June 30, 1966.

*Oakley Wade,* for the petitioners.
*J. C. Linge,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the taxable years 1960, 1961, and 1962 in the amounts of $52.88, $42.82, and $39.98, respectively.

The issues for our consideration are:

(1) Whether petitioners are entitled to deduct as an ordinary and necessary business expense under section 162, I.R.C. 1954,[1] that portion of each annual assessment paid by them to Highland Irrigation Co. which was used by that company to repay funds borrowed and used by it to construct a diversion dam for irrigation purposes and to purchase capital stock of the bank for cooperatives which loaned it the money.

(2) If petitioners are not so entitled, whether they are entitled to deduct as a soil and water conservation expense under section 175(a) that portion of each annual assessment paid to Highland Irrigation Co. for the aforementioned purposes.

(3) In the alternative, whether petitioners are entitled to reasonable deductions in each taxable year involved for depreciation with respect to said dam.

(4) Also in the alternative, whether petitioners are entitled to a casualty loss deduction under section 165(a) with respect to the original dam owned by Highland Irrigation Co. that was either damaged or destroyed in 1955.

#### FINDINGS OF FACT

Some of the facts are stipulated and are so found and incorporated herein by this reference.

Petitioners Robert L. and Mae V. Hunter are husband and wife living in Las Animas, Colo. They filed joint Federal income tax returns for the taxable years 1960, 1961, and 1962 with the district director of internal revenue, Denver, Colo. Mae V. Hunter is a petitioner herein only because she filed joint returns for the aforesaid

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

years, and hereinafter Robert L. Hunter will be referred to as petitioner.

During the taxable years 1960, 1961, and 1962 petitioner was engaged in the business of farming. In January 1955, petitioner purchased a farm near Las Animas, Colo. This farm is located in a semiarid area where the average annual rainfall is about 12 inches, and where the productivity of an irrigated farm as compared to a nonirrigated farm is in the ratio of approximately 4 to 1. Petitioner's farm is irrigated with water diverted from the Purgatoire River in Bent County, Colo., through the Highland Irrigation Co. diversion works and canal. In connection with the purchase of the farm petitioner also acquired 300 shares of the capital stock of Highland Irrigation Co.

Highland Irrigation Co. (hereinafter referred to as Highland or the company) is a mutual assessment corporation incorporated under the laws of the State of Colorado in 1914 and has been actively engaged in the business of furnishing water for irrigation to its stockholders since that time. Available water is prorated to the stockholders according to stock ownership.

During the taxable years involved herein Highland had issued an outstanding 3,800 shares of stock of which petitioner owned 300 shares. All of the stock issued by Highland was owned by 22 stockholders. Petitioner is vice president of Highland and a member of its board of directors.

With certain exceptions, such as the sale of assets or loans, Highland's only source of operating funds is from its stockholders. Such funds are obtained through assessments. Annual assessments are established by the member-stockholders at the annual meeting. The board of directors of Highland approve the expenditure of funds.

The failure of a member-stockholder to pay an assessment may cause Highland to sell the member's shares of stock thus making it impossible for such party to acquire water from Highland. The bylaws of Highland provide, *inter alia*, as follows:

No water shall be delivered or furnished to any stockholder who shall be in arrears in the payment of the annual maintenance charge or any assessment upon the shares of stock owned by him and no water shall be furnished by the Company to any person who is not a stockholder in the company, nor shall water ever be furnished to any stockholder except pro rata with all other stockholders in proportion to his ownership of said capital stock and without priority over all other stockholders except as permitted through the rotating or alternating system herein referred to.

The bylaws also provide for the forfeiture and sale of a stockholder's stock if he is in arrears for 3 months in the payment of any assessment.

Prior to 1955, Highland owned and had title to various assets used for the distribution of water to its stockholders, including a diversion dam on the Purgatoire River. Water was raised up from this river

by the dam and diverted into irrigation canals and ditches through which water was delivered to the stockholders. At each stockholder's farm there was a headgate which delivered the water to the individual farm. The dam was constructed about 1909 or 1911. Title to all of the assets used by Highland in connection with the distribution of water for irrigation purposes was vested in Highland. The irrigation system which Highland owned was intact and operating in 1955 when Hunter purchased his farm.

In June 1955 the center of the dam was washed out by a flood and it became necessary to either repair such dam or construct a new dam in order to furnish water to Highland's stockholders. Use of the old dam, with repairs, was continued through the summer of 1955, but based on this experience the stockholders determined that it was inadequate for the purpose of diverting water and its maintenance was too expensive. The stockholders voted to construct a new diversion dam and work thereon was commenced in 1955.

During the latter part of 1955 and the early part of 1956, Highland built a diversion dam about 30 feet directly below the site of the former dam at a cost to it of $76,297.27. No labor cost was incurred in the construction of the new dam since the stockholders did the work themselves. The old dam was left in place and used as a retaining wall during construction of the new dam, and because it tended to strengthen the north abutment of the new dam. The design of the new dam was prepared by the U.S. Government and the dam was constructed in accordance with specifications provided by the U.S. Government.

The new dam is 306 feet long and approximately 30 feet high. The material used in constructing the dam included 300 tons of steel railing, 3,200 cubic yards of rock, and heavy timbers. The excavation for the new dam extended down about 25 feet to shale or bedrock. Vertical rails (steel piling) were set in the excavation and concrete was used to hold the rails in place. Then horizontal rails were bolted or welded laterally to the upright rails. This network or "crib" extended across the length of the dam (about 300 feet), and was filled with sandstone and limestone rock. A facing consisting of a double row of timbers was applied to the upstream side of the crib.

The finished dam is about 30 feet in height but only 4 or 5 feet above the normal riverbed. There is a gate on one end to allow water to flow into the canal, and a spillway on the other end. The main canal carries the water which is ultimately used by the individual members of Highland. The new dam was in use at the time of the instant proceeding.

The source of the funds used to pay for the construction of the new dam was the amount of $23,135.79 paid by the U.S. Government and

the amount of $76,297.27 borrowed from Wichita Bank for Cooperatives, Wichita, Kans., hereinafter called the bank.

On January 6, 1956, Highland and the bank entered into a loan agreement wherein it was agreed that the bank would loan Highland money to be used for the construction of the new dam, an additional amount to renew a loan, and an additional amount to purchase 19 shares of stock of that bank, which Highland was required to purchase in order to borrow money from the bank. The total amount of the loan was $102,000, evidenced by two promissory notes of Highland, one in the amount of $92,000 with interest at $4\frac{1}{4}$ percent and the other in the amount of $10,000 with interest at $3\frac{1}{4}$ percent. These notes were secured by a first mortgage on all of Highland's assets, including specifically its entire reservoir, canal, and distribution system, including the diversion dam, and all of its water rights connected with the use of water for irrigation purposes. The mortgage provided that until the indebtedness secured thereby was paid in full, Highland would keep its dams, canals, and distribution system in good order and repair. It also provided that until the indebtedness was paid in full Highland would levy assessments on its outstanding capital stock sufficient to pay all of its operating expenses plus an amount sufficient to pay the indebtedness in accordance with the terms of the mortgage, would diligently collect all such assessments, and, in the event of delinquency in the payment of any such assessments, would not deliver water from its irrigation system to any delinquent stockholder.

The mortgage and the two notes were signed by Highland alone, and none of the stockholders of Highland, including petitioner, were personally liable on the notes or were obligated, in their individual capacities, to repay the funds borrowed from the bank.

Of the funds borrowed from the bank, Highland used $76,297.27 thereof to construct the new diversion dam, and $2,000 thereof to pay for the 19 shares of bank stock. Title to the new dam and the stock was vested in Highland.

During the years 1960, 1961, and 1962 Highland made assessments against its members totaling $11,400, $9,500, and $9,500, respectively. The amounts collected were used to pay its operating expenses and also to make payments of principal and interest on its debt and to pay for the bank stock. During 1960 Highland paid $2,400 on the principal of the debt and $381.08 on the bank stock; during 1961 it paid $2,600 on the principal of the debt and $411.58 on the bank stock; during 1962 it paid $2,800 on the principal of the debt and $257.60 on the bank stock.

Petitioner's share of the assessments was $900 for 1960, and $750 for each of 1961 and 1962, which he paid in those years and claimed as a deduction on his income tax returns for those years. Respondent determined, in his notice of deficiency, that $219.60 of the assessment

for 1960 was not allowable as a deduction, and that $237.90 and $241.50 of the assessments for the years 1961 and 1962, respectively, were not allowable as deductions.

The parties have stipulated that the amounts presently in dispute are $190.71 for the year 1960, $206.50 for 1961, and $207.73 for 1962, which represent the amounts of the total assessments paid by petitioner to Highland for each of those years which were applied by Highland to the payment of that portion of its loan from the bank which was used to construct the new dam and to pay for the bank stock.

During the taxable years here involved Highland filed Federal tax returns as a tax-exempt association (Form 990), and has never computed nor claimed depreciation on its dams or distribution facilities.

Petitioner had no cost basis in the dam that was partially destroyed by the flood in 1955.

In computing his taxable income for the years 1960, 1961, and 1962, petitioner did not claim a deduction for a casualty loss in any of such years because of the damage done to the dam in 1955.

## OPINION

The principal issue involved herein is whether petitioner is entitled to deduct that portion of each annual assessment paid to Highland Irrigation Co., a mutual assessment company, that was used by Highland to repay funds borrowed and used to construct a diversion dam and to pay for capital stock of the bank from which the funds had been borrowed. Petitioner's assessment for 1960 was $900 and was $750 for each of the years 1961 and 1962. Respondent contends that the portions of such payments by petitioner during the taxable years 1960, 1961, and 1962 in the respective amounts of $190.71, $206.50, and $207.73,[2] used by Highland for the above purposes, constitute capital expenditures within the purview of section 263 [3] and are nondeductible.

Petitioner contends that said assessments are ordinary and necessary expenses incurred in his operation of an irrigated farm business and allowable in full under section 162(a), or if not under that section then under section 175(c)(1) as a soil and water conservation expendi-

---

[2] Petitioner contends that the deductions in dispute are in the respective amounts of $190.74, $206.22, and $207.69. Any necessary adjustment between these amounts and those alleged by respondent will be made in the Rule 50 computation.

[3] SEC. 263. CAPITAL EXPENDITURES.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to—

\*     \*     \*     \*     \*     \*     \*

(C) soil and water conservation expenditures deductible under section 175,

\*     \*     \*     \*     \*     \*     \*

(2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.

ture. Alternatively, petitioner avers that if we hold that part of the assessment attributable to debt retirement and the purchase of stock in a bank by Highland were capital expenditures, then petitioner should be allowed a reasonable amount as a deduction for depreciation of the dam, or should be allowed the reduction in value of his farm resulting from the washout of the old dam as a casualty loss in 1955 under section 165.

For reasons hereinafter discussed, we agree with respondent.

It is fundamental, of course, that the extent of allowable deductions is dependent exclusively upon legislative grace and does not turn upon equitable considerations; that a taxpayer claiming a deduction must bring himself squarely within the terms of a statute expressly authorizing it; and that a taxpayer claiming a deduction bears the burden of proving the facts on the basis of which such deduction is allowable under the applicable statutory provision. *New Colonial Co.* v. *Helvering*, 292 U.S. 435 (1934) ; *United States* v. *Woodall*, 255 F. 2d 370, 372 (C.A. 10, 1958), certiorari denied 358 U.S. 824; *United States* v. *Akin*, 248 F. 2d 742, certiorari denied 355 U.S. 956; *Chicago Mines Co.* v. *Commissioner*, 164 F. 2d 785, 787.

Primarily, petitioner urges that the water assessments paid by him to Highland constitute a "service charge" for the rendition of a service essential to the carrying on of his business of irrigated farming, and, therefore, the annual assessment is deductible in full as an ordinary and necessary business expense under section 162(a). It is petitioner's position that in the event of nonpayment of any part of such assessment, water would not be delivered to his farm and his stock and water rights could be sold, as provided in the corporate bylaws and in the real estate mortgage securing Highland's indebtedness to the bank, and that any payments made to Highland for the critical water supply constitute ordinary and necessary expense regardless of how Highland used the funds.

Undoubtedly the water furnished to petitioner's farm was essential to his operations. However, we cannot construe the water assessment in dispute as a "service charge" similar to that which a supplier of utilities would ordinarily charge a customer. The expenditure in controversy is the portion of the assessment which Highland used to repay the bank for the money which it borrowed to build a new dam for its stockholders, and to pay for stock in the bank that Highland was required to purchase in order to borrow the money. If Highland for some reason could not meet the water requirements of its members, we believe that petitioner and the other stockholders would, nevertheless, be obliged to pay their full annual assessment to Highland, including a prorata share of the amount required to be paid on the indebtedness and the stock. Petitioner was paying for more than

an allotment of water; he acquired a stockholder's equitable interest in a new diversion dam and shares of the capital stock of a bank, title to which was vested in Highland, which were capital assets in the hands of Highland; and he was enhancing the value of his stock in Highland by reducing the long-term indebtedness of that company.

Generally, expenditures made to acquire a capital asset or a like advantage, that has an economically useful life beyond the taxable year during which the expenditures are made, are not deductible as ordinary and necessary expenses. *Hotel Kingkade* v. *Commissioner*, 180 F. 2d 310, 312. It is clear that the expenditures in question were for the replacement of the old dam, that the new dam was subject to wear and tear, that it had a determinable useful life, and that that useful life was in excess of 1 year. The material used in the construction of the replacement dam included 300 tons of steel rails, 3,200 cubic yards of rock, heavy timbers, and other material, cost approximately $76,297.27, and the new dam was in use at the time of the instant trial. It was a structure that would clearly be depreciable under section 167 if used in a taxpayer's trade or business.

We find no merit in petitioner's contention that the expenditures in question were for the "repair" of the old dam, a part of which remained in the Purgatoire River as an integral part of the overall irrigation system. The record shows that the new dam was constructed 30 feet downstream from the site of the former dam, was of a different and sturdier type of construction, and undoubtedly has a greater useful life than the old dam. Admittedly, a portion of the old dam was left in place so that it was not necessary to construct a new headgate, but that portion of the old dam was used only as a part of the headgate and not as a section of the new dam which spanned the river and caused the water to rise and flow into the headgate. The record indicates that Highland and its stockholders had attempted to repair the old dam without success, and then decided to build a new dam. See *A. Raymond Jones*, 25 T.C. 1100; *Harris Hardwood Co.*, 8 T.C. 874; *Scovill Manufacturing Co.*, 25 B.T.A. 265; *Abbott Worsted Mills, Inc.* v. *Peter Gagne*, an unreported case (D.N.H. 1942, 30 A.F.T.R. 1726, 42–2 U.S.T.C. par. 9694).

Furthermore, we find no basis for allowing petitioner a deduction with respect to the portions of assessments used by Highland to pay for the bank stock. Payments by Highland for the stock represented a capital contribution to the bank and under normal circumstances would not be deductible by petitioner. Rev. Rul. 65–214, 1965–2 C.B. 234.

We believe petitioner's basic argument is directly refuted by *United States* v. *Akin, supra*, a case involving strikingly similar facts decided

by the Court of Appeals for the Tenth Circuit, the circuit wherein this case arose, and that that case is controlling on this point. In that case taxpayers deducted as ordinary and necessary business expenses payments made in 1949 and 1950 to a mutual assessment irrigation company in Colorado. The assessments included an item for the retirement *pro tanto* of a long-term indebtedness, and an item for the purchase of a right-of-way. Holding that the portions of taxpayers' assessments which were used for such purposes were capital contributions and not deductible as ordinary and necessary business expenses the Court of Appeals for the Tenth Circuit stated (pp. 743, 744):

Section 23(a)(1)(A) of the Internal Revenue Code of 1939 * * * authorizes a deduction from gross income of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. But the statute is limited to ordinary and necessary expenses paid or incurred in the conduct of a trade or business and does not authorize a deduction for capital expenditures. * * * It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year. * * *

\*  \*  \*  \*  \*  \*  \*

As we understand the law of Colorado, the two mutual ditch companies organized in that state are nonprofit corporations; each owns the naked legal title to its ditches and related facilities used in the distribution of water to its members, including the taxpayers, for use upon their lands but the owners of the farms served in that manner are the equitable and actual owners of such ditches and related facilities in proportion to their respective interests; the stock certificates issued by the companies to their members are merely muniments of title to their water rights; and the value of the stock is in the water rights which it represents. * * * But in each instance here, the ditch company was the only one liable upon the outstanding indebtedness for the retirement of which a portion of the amounts paid by the taxpayers to the ditch company was to be used. The taxpayers were not personally liable for any portion of the indebtedness. And the intended purpose and resulting effect of the payments made by the taxpayers to the ditch companies for use in the retirement pro tanto of the principal together with the accrued interest thereon was to strengthen the financial position of the ditch companies by reducing their long-term obligations. In respect to federal revenue legislation, the payments of assessments for such purpose fell within the range of capital contributions to the ditch companies, respectively, rather than ordinary and necessary expenses incurred in carrying on the business of the taxpayers. * * * The legal title to the right of way acquired with the proceeds of the assessments for that purpose was taken in the name of the ditch company. And the purpose in acquiring and taking legal title to the right of way was to expand the distribution system by creating an addition to it. Again, the payments of the assessments for that purpose constituted capital contributions, not ordinary and necessary expenses incurred by the taxpayers in carrying on their businesses. * * *

Here, as in the *Akin* case, that portion of the assessments in controversy was applied to pay indebtedness incurred by Highland to acquire capital assets, petitioner was not liable on the indebtedness, and legal title to the capital assets was in Highland. That portion of the assessments was in the nature of capital contributions to Highland and was not deductible by petitioner as ordinary and necessary business expenses. See also *Denver & Rio Grande Western Railroad Co.* v. *Commissioner*, 279 F. 2d 368 (C.A. 10, 1960), affirming 32 T.C. 43; *Glenn L. Heigerick*, 45 T.C. 475; *S. M. Howard*, 39 T.C. 833; *Kauai Terminal, Ltd.*, 36 B.T.A. 893; *Scovill Manufacturing Co.*, *supra;* *Illinois Merchants Trust Co.*, *Executor*, 4 B.T.A. 103.

In support of his position petitioner relies on *Anaheim Union Water Company* v. *Commissioner*, 321 F. 2d 253 (C.A. 9, 1963), affirming in part and reversing in part 35 T.C. 1072. That case is clearly distinguishable. There the taxpayers were nonprofit corporations organized to furnish water to their shareholders. Because of revenues produced by rents and royalties, the taxpayers charged their shareholders less than cost for the water supplied to them. The issue was whether taxpayers were entitled to deduct their costs in excess of the charges made to the shareholders for the water. The Court of Appeals held that all of the taxpayers' expenses in delivering water to its shareholders were ordinary and necessary within the purview of section 23(a)(1)(A), I.R.C. 1939, and section 162(a), I.R.C. 1954. Unlike the case at bar, in *Anaheim* the taxpayers were not the recipients or users of the water, but were in the business of furnishing water to their stockholders, and no part of the expenditures involved were incurred in acquiring a capital asset, as in the instant case.

Petitioner also relies on, *inter alia*, *Slaymaker Lock Co.*, 18 T.C. 1001, reversed on other grounds sub nom. *Sachs* v. *Commissioner*, 208 F. 2d 313 (C.A. 3, 1953); *Weil Clothing Co.*, 13 T.C. 873; *Holt-Granite Mills Co.*, 1 B. T. A. 1246, and several unpublished Memorandum Opinions of this Court. Those cases are also distinguishable and do not support petitioner's argument here. They stand generally for the proposition that contributions made by employees to organizations established to provide recreation, sick benefits, etc., for its employees are deductible by the employers as ordinary and necessary business expenses even though some of the funds may be used by the employee organizations to acquire or construct capital improvements. The payments were considered necessary in order to retain the employees. Those cases are not controlling here; in *Slaymaker* the Court distinguished some of the cases we have cited about in support of our conclusion. Further, we consider Rev. Rul. 58–534, 1958–2 C.B. 125, cited by petitioner, which provides that the portion of an assessment used by a nonprofit corporation to pay operating expenses is deductible

as an ordinary and necessary expense by the shareholder but the portion of an assessment used by the corporation to acquire capital assets is not deductible by the shareholder, to be consonant with our conclusion above and of no assistance to petititoners here.

Petitioner contends alternatively that if the cost of the replacement dam is a capital expenditure, as we have concluded, it is nevertheless deductible as a soil and water conservation expense under section 175(a) and (c)(1).

Section 175(a) provides:

A taxpayer engaged in the business of farming may treat expenditures which are paid or incurred by him during the taxable year for the purpose of soil or water conservation in respect of land used in farming, or for the prevention of erosion of land used in farming, as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

Section 175(c) defines such expenditures as:

expenditures paid or incurred for the treatment or moving of earth, including (but not limited to) * * * the construction, control, and protection of diversion channels, drainage ditches, earthen dams, watercourses, * * *

Section 175(c) goes on to provide:

Notwithstanding the preceding sentences, such term also includes any amount, not otherwise allowable as a deduction, paid or incurred to satisfy any part of an assessment levied by a soil or water conservation or drainage district to defray expenditures made by such district which, if paid or incurred by the taxpayer would without regard to this sentence constitute expenditures deductible under this section.

Relying on the aforesaid sections, petitioner urges that water conservation implies "water utilization" and that the terminology in section 175(c) "including (but not limited to)" specifies that it shall not be limited to diversion channels, drainage ditches, earthen dams, etc.; that the "construction, control, and protection of diversion channels" implies the construction of a dam to put the water in that diversion channel; and that the function of the dam in the Purgatoire River is just as essential for the use of his land for farming as the construction of a diversion channel in the river leading the water to petitioner's farm.

Petitioner's argument must be considered not only in the context of the legislative history of section 175 but also in the context of section 175(c)(1)(A), which provides that deductible soil and water conservation expenditures do not include—

(A) the purchase, construction, installation, or improvement of structures, appliances, or facilities which are of a character which is subject to the allowance for depreciation provided in section 167, * * *

Respondent's regulation, sec. 1.175, Income Tax Regs., provides generally that under section 175 a farmer may deduct his soil or water conservation expenditures which do not give rise to a deduction for

depreciation, and which are not otherwise deductible. More specifically, a farmer may deduct expenditures made for these purposes which are for the treatment or moving of earth, the construction of diversion channels, irrigation ditches, earthen dams, etc. Section 1.175–2(b) of the regulations provides:

(1) The method described in section 175 applies only to expenditures for nondepreciable items. Accordingly, a taxpayer may not deduct expenditures for the * * * construction * * * or improvement of structures * * * or facilities subject to the allowance for depreciation. Thus, the method does not apply to depreciable nonearthen items such as those made of masonry or concrete (see section 167). For example, expenditures in respect of depreciable property include those for materials * * * for making structures such as * * * dams * * * composed of masonry, concrete, tile, metal, or wood. However, the method applies to expenditures for earthen items which are not subject to a depreciation allowance. For example, expenditures for earthen terraces and dams which are nondepreciable are deductible under section 175. * * *

Section 1.175–2(c) of the regulations further provides as follows:

*Assessments.* The method applies also to that part of assessments levied by a soil or water conservation or drainage district to reimburse it for its expenditures which, if actually paid or incurred during the taxable year by the taxpayer directly, would be deductible under section 175. * * * The provisions of this paragraph may be illustrated by the following example:

*Example.* In 1955 a soil and water conservation district levies an assessment of $700 upon a farmer on the cash method of accounting. The assessment is to reimburse the district for its expenditures in 1954. The farmer's share of such expenditures is as follows: $400 for digging drainage ditches for soil conservation and $300 for assets subject to the allowance for depreciation. If the farmer pays the assessment in 1955 and has adopted the method of treating expenditures for soil or water conservation as current expenses under section 175, he may deduct in 1955 the $400 attributable to the digging of drainage ditches as a soil conservation expenditure subject to the 25-percent limitation.

We find respondent's regulation to be a reasonable implementation of the statute. Section 175 was first enacted into law as a part of the Internal Revenue Code of 1954. The report of the House Ways and Means Committee, H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 28, 29 (1954), contains the following statements:

Under present law expenditures made by farmers to improve their land are generally required to be capitalized rather than being deducted as current expenses. The capitalized expenditures increase the farmer's tax basis for the land and since land is not depreciable, are recoverable for tax purposes only upon sale of the land. However, there has been some confusion under present law about the deductibility of such expenditures since the Tax Court has held that substantial expenditures for the terracing of farms may be regarded as maintenance costs and, hence, be deducted as current expense.

Your committee has adopted a provision which permits farmers to elect to expense, rather than capitalize, expenditures for soil and water conservation, including the expenditures for the prevention of land erosion. * * *

\*          \*          \*          \*          \*          \*          \*

Expenditures for soil and water conservation mean expenditures for treatment or moving of earth. * * * These expenditures do not include the purchase or construction of facilities * * * and structures subject to allowance for depreciation.

The report of the Senate Finance Committee, S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 216, 217 (1954), which added the provision making deductible expenditures by farmers to satisfy special assessments of soil or water conservation districts to defray expenditures made by such districts for soil and water conservation, contains the following statements:

Subsection (c)(1) also makes it clear that expenditures for the * * * construction * * * or improvement of structures * * * or facilities which are of a character subject to the allowance for depreciation, may not be deducted under this section. Language added by your committee makes certain that expenditures for earthen dams, if such items are not depreciable, may be deductible under section 175. * * *

Thus, such a district may levy an assessment of $1,000 during the taxable year which represents the taxpayer's allocable share of expenditures made by the district in the following proportions: $500 for digging of natural drainage ditches, $250 for amounts otherwise deductible under section 164(b)(5) and $250 for the acquisition of depreciable assets. If the taxpayer paid such an assessment during the year, only the first $500 noted above would be deductible. Thus, if a taxpayer is assessed $1,000 during the taxable year by the district and pays such an amount, only $250 would be deductible by the taxpayer under this section if $500 of the $1,000 was used by the district to purchase a depreciable building and $250 represented amounts otherwise deductible under section 164(b)(5).

It is apparent from the above that section 175 was intended to allow a farmer to deduct as a current expense expenditures made, either directly or in the form of assessments by mutual assessment corporations, for soil and water conservation expenses of the character which, being considered an improvement to the land, had previously not been deductible either as an operating expense or through depreciation deductions. It is clear that the section was not intended to and does not allow a deduction to a farmer as a current expense for expenditures made to acquire capital assets either directly or by a mutual assessment corporation. Inasmuch as we have concluded that the dam here involved and the bank stock are capital assets, we must also hold against petitioner on this alternative argument.

Petitioner's second alternative contention is that if we hold the new dam to be a capital asset subject to depreciation, he should be allowed a deduction for depreciation of "their assets" under section 167. Petitioner did not claim a deduction for depreciation on his returns and he does not suggest the amount of depreciation that should be allowed.

It is axiomatic that to be entitled to depreciation under section 167 the taxpayer must have an investment in the property sought to

be depreciated, *Commissioner* v. *Revere Land Co.*, 169 F. 2d 469, reversing 7 T.C. 1061, certiorari denied 355 U.S. 853, and that the investment must be of such a character as to give the taxpayer a depreciable interest in the property. Ownership of the property is usually required, but the existence of bare legal title in another does not always deprive the taxpayer of a depreciation deduction if it is shown that the taxpayer in fact is the one who suffers the economic loss of his investment by virtue of the wear and tear or exhaustion of the property. But the loss to the taxpayer must be a present one, not just a possibility, and it must relate to taxpayer's investment in the property. *Weiss* v. *Wiener*, 279 U.S. 333. Consequently, a stockholder is not usually entitled to a depreciation deduction for property owned by his corporation because he has no direct economic interest or investment in the property. *Fleming G. Railey*, 36 B.T.A. 543. Under normal circumstances the corporate entity will not be ignored. *Moline Properties* v. *Commissioner*, 319 U.S. 436; *Skarda* v. *Commissioner*, 250 F. 2d 429 (C.A. 10, 1957), affirming 27 T.C. 137. Where the corporation is the owner of the property and uses it in its business, the corporation, not the stockholders, is entitled to the depreciation deduction.

Such would seem to be the situation here. There is nothing in the record to warrant ignoring the corporate entity of Highland as being spurious. It has been in existence and serving its corporation function since 1914. Highland borrowed the money to build the new dam. It alone is liable on the indebtedness and title to the dam is in its name. The fact that Highland is tax exempt and derives no tax benefit from the depreciation deduction does not shift the depreciable interest in the property from the corporation to its stockholders.

Petitioner relies on *Helvering* v. *Lazarus & Co.*, 308 U.S. 252, and Rev. Rul. 55-25, 1955-1 C.B. 283, to support his argument that the depreciation deduction "is not predicated upon ownership of title," "but upon investment—having a capital interest in the asset." While we may not dispute the basic premise of petitioner's argument, we have no basis to find that petitioner had a direct investment or capital interest in the dam. In the *Lazarus* case the Court found that the taxpayer had made the depreciable capital investment in the property and had not recovered it through the purported sale and leaseback, because the sale was actually a loan secured by the property involved. Rev. Rul. 55-25, *supra*, also involved a security transaction and is likewise distinguishable and of no support to petitioner's argument here.

We would have no hesitancy in deciding this point for respondent except for the statement made in *United States* v. *Akin, supra*, to the effect that under Colorado law the two mutual ditch companies there involved were nonprofit corporations which owned the naked legal

title to their ditches and related facilities, but the farmers served by the companies were the equitable and actual owners of the ditches and related facilities in proportion to their respective interests, the stock certificates issued by the companies to their members being merely muniments of title to their water rights, with the value of the stock being in the water rights which it represented. If we assume, absent evidence in the record with respect thereto, that the above statement would apply to Highland and the dam involved herein, could it not be forcibly argued that the stockholders of Highland, including petitioner, are the equitable and actual owners of the dam and have a depreciable interest in the dam? We must reject this argument, however, because while rights and interests in property are determined under State law, the right to depreciation deductions for Federal tax purposes must be determined under Federal revenue legislation. *Burnet* v. *Harmel*, 287 U.S. 103; *Morgan* v. *Commissioner*, 309 U.S. 78; *United States* v. *Akin*, *supra*. Federal law requires that to be entitled to a depreciation deduction the taxpayer must have a depreciable investment in the property being depreciated. Petitioner has no such investment in this dam. Highland alone had an investment in the dam; petitioner's original investment was in stock of the company, and that portion of his assessments used to retire the indebtedness incurred to build the dam simply strengthened the financial position of Highland by reducing its indebtedness and thus enhanced the value of his stock and his water rights. *United States* v. *Akin*, *supra*. It could be said with equal force that the stockholders of any corporation are the equitable owners of the depreciable assets of the corporation, but it cannot be argued that by reason thereof they are entitled to a deduction for depreciation of those assets on their own individual returns. Compare *Charles R. Holden*, 27 B.T.A. 530; *Wood* v. *Rasquin*, 21 F. Supp. 211 (E.D.N.Y. 1937).

We see no reason why Congress, through equitable considerations, might not enact legislation similar to section 175, which would permit the pass through of depreciation deductions on property owned by a mutual assessment company to its stockholders, as it did in section 175 with respect to assessments for soil and water conservation expenses, but Congress has not seen fit to do so to date and we cannot legislate for it.[4]

---

[4] See *Lake Forrest, Inc.*, a Memorandum Opinion of this Court on remand, filed in 1963, for a discussion of whether the cooperative apartment corporation or its tenant-stockholders are entitled to a deduction for depreciation of the buildings and improvements occupied by the tenant-stockholders, holding that the corporation is entitled to the deduction. It is pointed out that it had been only through specific legislation that cooperative tenant-stockholders were placed in the same position as owners of real property with respect to some tax deductions, but without such specific legislation they were not to be treated as owners for tax purposes.

For the above reasons we hold that petitioner is not entitled to a depreciation deduction with respect to the dam. In addition, we have no evidence of the useful life of the dam, and would have no basis upon which to compute a depreciation deduction were it allowable to petitioner.

Petitioner's final argument is that he should be allowed a casualty loss as a result of the damage he suffered when the old dam was washed out by the flood. There are several reasons why we disagree with petitioner on this point, but to avoid prolonging this opinion any further, we point out that a casualty loss is allowable only in the year in which the loss is sustained, and here the dam was washed out in 1955, a year not before us. Sec. 165 (a).

We hold for respondent on all the issues presented to us, but since the parties stipulated that the additions to income set forth in the statutory notice of deficiency should be reduced.

*Decision will be entered under Rule 50*