BEVERLY A. WEILER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Weiler v. Commissioner
Docket Nos. 13025-87, 13026-87, 24423-88
United States Tax Court
T.C. Memo 1990-562; 1990 Tax Ct. Memo LEXIS 634; 60 T.C.M. (CCH) 1137; T.C.M. (RIA) 90562; October 29, 1990, Filed *634 Decisions will be entered under Rule 155. Charles H. Sabes and Douglas Scott Maynard, for the petitioners. Patricia Anne Golembiewski and Sheila Olaksen, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION These consolidated cases were assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7443A(b) of the Internal Revenue Code and Rule 180 et seq. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. *636 OPINION OF THE SPECIAL TRIAL JUDGE Respondent determined the following Federal income tax deficiencies, additions to tax and increased interest: BEVERLY A. WEILER Additions to Tax and Increased Interest Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
6621(c)
1980
$ 6,295.13
$ 314.76
-   -
$ 1,888.54
**
1981
8,286.00
-   $ 414.30
*
2,485.80
**
1982
4,556.87
-   227.84
*
1,367.06
**
1983
8,583.00
-   429.15
*
2,574.90
**
1984
3,517.00
-   176.00
*
1,055.00
**
ROBERT SMITH AND JANET SMITH Additions to Tax and Increased Interest Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
6621(c)
1980
$  6,611.00
$ 331.00
-   -
$ 1,983.00
**
1981
9,531.00
-   $ 477.00
*
2,859.00
**
1983
10,584.00
-   529.00
*
3,175.00
**
1984
4,976.00
-   249.00
*
1,493.00
**
*637 In the alternative to his determination under section 6659, respondent determined that petitioners in both cases were liable for the additions to tax for the years here involved under section 6661. On brief, respondent concedes that section 6661 is inapplicable to the years 1980, 1981, 1982, and 1984. Petitioners were involved in certain transactions with Gold Depository and Loan Company, Inc. (GD&L) in which they purportedly purchased marine dry cargo containers from GD&L and then purportedly leased the containers to third parties through GD&L acting as petitioners' agent. Petitioners claimed Schedule C losses and investment tax credits, as well as carrybacks resulting therefrom, with respect to the transaction with GD&L. At the trial, petitioners agreed that the containers never existed and they conceded the relevant income tax deficiencies for the years involved. The issues remaining for decision *638 are: (1) Whether petitioners are liable for additions to tax for negligence or intentional disregard of rules and regulations under sections 6653(a), 6653(a)(1) and (a)(2); (2) Whether petitioners are liable in each of the taxable years involved for additions to tax for valuation overstatements under section 6659; or, in the alternative, whether petitioners are liable for additions to tax for substantial understatement of income tax in the year 1983 under section 6661; (3) Whether petitioners are liable for an increased rate of interest on deficiencies attributable to tax motivated transactions under section 6621(c); and (4) Whether petitioners are liable for a penalty under section 6673. FINDINGS OF FACT Some of the facts were stipulated and they are so found. Beverly A. Weiler was a resident of Santa Clara, California, at the time the petition in docket No. 13025-87 was filed. She was a resident of San Jose, California, when she filed her petition in docket No. 24423-88. Robert and Janet Smith were residents of San Jose, California, at the time the petition in docket No. 13026-87 was filed. The Container Industry
A marine dry cargo container (container) is *639 a large, reusable box designed and constructed for shipping dry cargo. The body of a container is generally constructed of steel or fiberglass and aluminum while the floor is usually made of wood. The standard container size is 8 1/2 feet high, 8 feet wide, and either 20 or 40 feet long. The standard industry measurement for marine dry cargo containers is the TEU (twenty-foot equivalent unit), measured by the length of the container. Containers are intermodal; that is, they can be used on ships between ports, then transferred to other modes of transportation on land to reach their final destination. Because the contents remain in the container through the various stages of transportation, container usage reduces labor costs as well as damage and pilferage. Respondent's expert witness, John Maccarone, is knowledgeable about the container industry. Mr. Maccarone became involved in the marine cargo leasing industry in 1977. The industry is comprised of container shipping companies and container leasing companies. A shipping company owns its ships and is contracted to move goods around the world. A leasing company provides the containers needed by the shipping company. Some leasing *640 companies are conventionally financed; that is, they borrow money to buy containers and then lease the containers to shipping companies. Some conventionally financed leasing companies acquire capital through the sale of interests in publicly registered limited partnerships. Other leasing companies are management companies, managing fleets of containers owned by others. Utilization rates refer to the percentage of containers in a fleet which are producing income. During 1983, the average utilization rate for the industry was 65 percent, having reached the lowest point of a six-year decline. From 1974 through 1989, the utilization rate was less than 90 percent for all but two years. Information concerning utilization rates was available in the annual reports of publicly traded leasing companies. An individual container is generally identified by a four-letter code, called a reporting mark and a seven-digit serial number. The reporting mark is the same for every container in a fleet and serves to identify the owner, whereas the serial number is unique to each container. Reporting marks are assigned or issued by the International Container Bureau (BIC), located in Paris, France, *641 which annually publishes a listing of all its marks. BIC assigns marks to containers used in international commerce. Additionally, the Official Intermodal Equipment Register-Director of Intermodal Services (the "Register"), located in New York, lists containers which use United States ports. The Register lists the marks assigned by BIC as well as each container's owner, dimensions and weight load capacity. Owners must pay a fee for the Register's listing service. Registration helps keep track of containers and their contents, and serves to advertise an owner's containers to shippers interested in leasing containers. Each time a container is transferred from one freight handler in one mode of transportation to another freight handler in another mode of transportation, such as from ocean-going vessel to railroad, an inspection and receipt form is completed and exchanged between handlers. The Intermodal Transportation Association has a standard inspection and receipt form entitled "Equipment Interchange Receipt and Safety Inspection Report." Each form shows the date, time, and place of the transfer and includes a detailed description of any damage discovered during the inspection. *642 The reporting mark assigned by BIC is also recorded. The GD&L Promotion
GD&L was a member of a group of companies known as the Co-op Banking Group Companies (the "Co-op Group"). The managing director of the Co-op Group was Aleksandrs V. Laurins. Co-op Investment Bank, Ltd. (Co-op) was also a member of the Co-op Group. Co-op maintained its registered office in St. Vincent, West Indies. Co-op was not incorporated under the laws of the United States or any State in the United States, was not regulated as a banking institution by any Federal or state authority, was not a member of the Federal Deposit Insurance Corporation, and was not listed with the Federal Home Bank Board. Beginning in 1982, GD&L sold and arranged the sale of marine dry cargo containers. Tax Planners and Associates (TPA) acted as a broker for GD&L. Each purchaser was required to purchase a minimum of one container unit representing a $ 100,000 investment, but could finance 95 percent of the purchase. GD&L offered to arrange the financing through Co-op. The prospectus contained the following information about the financing: The loan will mature in five years. The containers purchased for the *643 purchasers will secure the loan. In addition, the purchaser will be personally liable for the portion of the debt representing 16% of the purchase price. The purchaser will pay interest on the full loan amount on an annual basis. Each purchaser must, in addition, pay an amount equal to 15% of the purchase price each year into a sinking fund. It is contemplated that the interest and sinking fund payments will come from the rental income; however, no guaranty concerning this can be made. Payments to the sinking fund will not reduce the balance of the loan until the loan matures in 1988. At that time the sinking fund is expected to total 75% of the purchase price, leaving a balance due on the loan of 20% of the purchase price. This balance is non-recourse and is secured only by the containers. * * *
The American Real Estate Investment Trust (AREIT), a business trust organized in 1973, provided short-term loans to some investors for the 5 percent cash down payment. During the years in issue, Mr. Laurins was a member of the Board of Trustees of AREIT. As part of the container program, GD&L also offered to act, for a period of 35 months after the purchase, as the non-exclusive *644 leasing agent of the containers on behalf of the purchaser. The offering materials listed a range of minimum daily rental rates that GD&L expected to obtain for the purchaser: from $ 1 to $ 3 per day for 20-foot containers, and from $ 1.60 to $ 4.75 per day for 40-foot containers. GD&L was to receive 15 percent of all revenues from such leases as a management fee. The offering materials left open the possibility that GD&L would continue to act as the purchaser's leasing agent beyond the initial thirty-five month period, but GD&L did not obligate itself to do so. GD&L promised only that it would exercise its best efforts in obtaining leases during the initial period, and explicitly warned potential investors that the risk of nonpayment by the lessees will be borne by the purchasers. GD&L also did not obligate itself to assist the purchaser in reselling the containers at the end of the initial period. GD&L advised potential investors that it was not possible to estimate the resale value of a used container. The offering materials contained several other warnings to notify investors that the use of substantial leverage to purchase containers magnified the normal risks of such a purchase. *645 Potential investors were also warned that a purchaser may incur adverse tax consequences. The offering materials also indicated the following tax savings flowing from the container program: The tax law requires that investors be at risk for at least 20% of the total investment. Our program calls for 21% at risk - the 5% down payment and the 16% recourse portion of the debt. All of this recourse portion of the debt for which the purchaser might be liable is more than covered by the lease payments accumulated during the first two years. The rest of the liability is non-recourse; only the containers themselves can be looked to in case the rents are insufficient to pay the debt. However, this apparent total risk of $ 21,000 ($ 5,000 initially and $ 16,000 recourse) is offset by the $ 10,000 investment tax credit and the $ 19,525 deduction from income for the first two years. In a 50% tax bracket situation, that amounts to a total of $ 19,762 in tax savings within the first two years.
The materials further noted a tax benefits-to-initial cost ratio of more than 4 to 1 over a five year period for investors in the container program. GD&L did not register *646 any containers with either BIC or the Register, but, instead, assigned inventory control numbers to the containers that it purportedly sold to investors. Co-op invited GD&L's investors to register their containers with the Equipment Owner's Registry Association (EORA), located in Geneva, Switzerland. After paying a $ 50 fee, GD&L investors received documentation from EORA showing the inventory control numbers given to the containers by GD&L. Beverly Ann Weiler's Transactions
During 1983 and 1984, petitioner Beverly Weiler was employed as an engineer by a high-technology firm in the San Francisco area. Her employment activities did not involve any facet of container purchasing or leasing; nor had she had any other contact with the container industry. Petitioner Weiler first learned about GD&L's container program from bulletins posted in the common areas at her place of employment. In September 1983, she contacted Tax Planners and Associates. Petitioner Weiler received from TPA a copy of GD&L's prospectus and a brochure on the Co-op Group. A TPA representative discussed several different investment opportunities with petitioner Weiler, including the GD&L container program *647 in which she decided to invest. On September 28, 1983, petitioner Weiler signed the first of two identical documents titled "Container Purchase and Lease Agreement." On November 17, 1983, she signed the second document. Each document purports to be an agreement between GD&L and petitioner Weiler whereby GD&L was to sell or arrange to sell a number of containers to petitioner Weiler and then act as her agent for the purpose of leasing the purchased containers to third parties. The essential provisions of the agreements are as follows: * * * 1. Purchaser agrees to buy and GD&L agrees to sell or arrange the sale of marine dry cargo containers for a total purchase price of $ 100,000.00, at the purchase prices and terms described in Paragraphs 2 and 3 below. 2. One forty-foot container, valued at $ 4,0000, and three twenty-foot containers, valued at $ 2,000 each, for each $ 10,000 unit of the total purchase price. 3. * * * In the event the Purchaser pays a portion of the purchase price with a loan, the loan shall be: Eleven percent (11%) per annum interest rate, with interest only for five (5) years, with sinking fund of fifteen percent (15%) of the total *648 purchase price each year. Principal due and payable at end of five (5) years. Loan liability limited to no more than sixteen percent (16%) of total purchase price and pledge of sinking fund paid. 4. Owner/Lessor appoints GD&L as his non-exclusive agent for the purpose of leasing the containers described in Paragraph 2 above. 5. GD&L agrees to use its best efforts to lease the containers described in Paragraph 2 above in transportation to and from the U.S.A., and to see that said containers are placed in service during the month of December 1983. 6. This agreement shall terminate thirty-five (35) months after the date on which it is executed or such earlier date as Owner/Lessor terminates the Agreement by written notice to GD&L. The termination of this Agreement shall not affect any then existing leases obtained by GD&L for the containers owned by Owner/Lessor. 7. GD&L shall receive an annual lease management fee of One Dollar plus fifteen percent (15%) of the lease revenues received pursuant to container leases obtained through the efforts of GD&L.
The stated purchase price under each container purchase and lease agreement was $ 100,000, *649 payable by a $ 5,000 cash down payment and the balance of $ 95,000 as a loan. Petitioner Weiler signed and returned both documents to TPA with two checks, dated September 29, 1983, and November 17, 1983, respectively. Each check, payable to GD&L in the amount of $ 2,500, represented a portion of the cash down payment for one of the two agreements. The remainder of the cash payment for each transaction ($ 2,500) was paid with the proceeds of a short-term loan petitioner Weiler received from AREIT. Both AREIT loans were represented by promissory notes. Petitioner Weiler did not sign any separate promissory notes or security agreements to secure the payment of the balances due ($ 95,000 for each agreement). Prior to December 31, 1983, Co-op issued four confirmation statements to petitioner Weiler. All four statements relate to one of her agreements with GD&L. Two of the statements purportedly confirm the sale of 10 new 40-foot and 30 new 20-foot containers to petitioner Weiler. The third statement purportedly confirms that the forty containers were leased by GD&L as agent for petitioner Weiler and declares that the minimum yearly gross rent for thirty-five months is guaranteed *650 to be at least $ 25,450 plus expenses. The fourth purportedly confirms the $ 95,000 loan from Co-op to petitioner Weiler. The four statements were accompanied by a cover letter from GD&L bearing the letterhead of both GD&L and the Co-op Group. Petitioner Weiler has been unable to locate any confirmation statements relating to her other agreement with GD&L. On December 31, 1983, Co-op sent two income and expense statements to petitioner Weiler, one relating to each of her agreements with GD&L. The statements are identical in every respect. Each reports $ 1,330.67 in 1983 rental income, $ 464.44 in interest expenses, and $ 201.26 in management fees paid for 1983. Petitioner Weiler never received an income check from GD&L or Co-op and never paid interest or management fees. On her 1983 Federal income tax return, petitioner Weiler reported a Schedule C loss in the amount of $ 27,171 with respect to container leasing. In computing her deduction for depreciation of the containers, petitioner Weiler used an adjusted basis of $ 200,000. On her 1983 return, she computed an investment tax credit (ITC) in the amount of $ 20,000 and claimed an ITC in the amount of $ 862. On May 2, 1984, petitioner *651 Weiler filed Form 1045, Application for Tentative Refund, claiming ITC carrybacks from 1983 to the years 1980, 1981, and 1982 in the amounts of $ 6,490, $ 8,286 and $ 4,362, respectively. On June 4, 1984, respondent allowed tentative refunds for the years claimed in the amounts of $ 6,295.13, $ 8,286.00 and $ 4,556.87, respectively. On Schedule C of her 1984 Federal income tax return, petitioner Weiler reported a loss in the amount of $ 14,754 with respect to her transactions with GD&L. On March 20, 1987, respondent issued a notice of deficiency to petitioner Weiler for the taxable years 1980 through 1983, disallowing the Schedule C loss and ITC for 1983 and the ITC carrybacks claimed for the years 1980, 1981, and 1982. On August 31, 1988, respondent issued a second notice of deficiency to petitioner Weiler for the taxable year 1984, disallowing the Schedule C loss claimed for that year. Robert Smith's Transactions
During 1983 and 1984, petitioner Robert Smith was employed as an engineer working with manufacturers of computer peripheral equipment; petitioner Janet Smith was employed as a sales clerk. Neither Mr. Smith's nor Mrs. Smith's employment activities involved *652 any facet of the container leasing industry. Nor did they have any other contact with the container industry. Prior to Mr. Smith's transactions with GD&L, his only investments were his personal residence and a rental property which was managed by his brother. At some time in 1983, Mr. Smith saw a TPA advertisement in the San Jose Mercury-News. In December 1983, he contacted TPA and met with TPA salesman Brooks Sackett who suggested several investment opportunities, including GD&L's container program. Mr. Smith received a copy of GD&L's prospectus and a brochure on the Co-op Group from TPA. On December 27, 1983, Mr. Smith signed a "Container Purchase and Lease Agreement" which he received from TPA. Other than the dollar amounts, there is no material difference between the document signed by petitioner Smith and those signed by petitioner Weiler. The total purchase price was $ 200,000, payable by a cash down payment of $ 10,000 with the balance payable as a loan. Mr. Smith returned the signed agreement to TPA with a check, dated December 27, 1983, in the amount of $ 10,000 payable to GD&L. Mr. Smith did not sign any promissory note or security agreement to secure the payment *653 of the balance of the purchase price ($ 190,000). Prior to December 31, 1983, Co-op issued four confirmation statements to Mr. Smith. Two of the statements purportedly confirm the sale of twenty new 40-foot and sixty new 20-foot containers. The third statement purportedly confirmed that the eighty containers were leased by GD&L as agent for Mr. Smith, and declared that the minimum yearly gross rent for thirty-five months was guaranteed to be at least $ 50,900 plus expenses. The fourth purportedly confirmed the $ 190,000 loan from Co-op to Mr. Smith. The four statements were accompanied by a cover letter from GD&L bearing the letterhead of both GD&L and the Co-op Group. On December 31, 1983, 1984, and 1985, Co-op sent year-end statements to Mr. Smith reporting income and expenses as follows: Year
Rental
Interest
Management
Ending
Income
Expenses
Fees
1983
$    166.33
$     58.06
$    25.16
1984
56,444.00
20,900.00
8,498.00
1985
56,444.00
20,900.00
8,498.00
Mr. Smith never received an income check from GD&L or Co-op and never paid interest or management fees. On Schedule C of his 1983 Federal income tax return *654 Mr. Smith reported a loss in the amount of $ 20,067 with respect to a container leasing activity. In computing his deduction for depreciation for the containers, petitioner Smith used an adjusted basis of $ 190,000. On his 1983 return, he computed an investment tax credit (ITC) in the amount of $ 20,000 and claimed an ITC in the amount of $ 3,858. On June 21, 1984, Mr. Smith filed a Form 1045, Application for Tentative Refund, claiming ITC carrybacks from 1983 to the years 1980 and 1981, in the amounts of $ 6,611 and $ 9,531, respectively. On August 2, 1984, respondent allowed tentative refunds for 1980 and 1981 in the amounts claimed. On his joint Federal income tax return for 1984, Mr. Smith reported a Schedule C loss in the amount of $ 10,954 with respect to his transactions with GD&L. On or about December 31, 1985, petitioner Smith was contacted by the Internal Revenue Service (IRS). Because of uncertainties raised by the IRS about GD&L's container program, Mr. Smith did not report losses with respect to that program on his 1985 joint Federal income tax return. On March 28, 1987, respondent issued a notice of deficiency to the petitioners Smith in which he disallowed the *655 ITC carrybacks for 1980 and 1981, the Schedule C loss and ITC claimed in 1983 and the Schedule C loss claimed in 1984. The IRS Investigation
Respondent introduced IRS revenue agent Charles Tonna as a witness to testify with respect to his investigation of GD&L. The initial information Mr. Tonna reviewed consisted of two versions of GD&L's 1983 offering materials and the Co-op Group brochure. From his review of those materials, Mr. Tonna observed several factors which convinced him to pursue the investigation: 1) the GD&L program required a very small down payment, some five percent; 2) the remainder of the purchase price was financed through a related company; 3) the promotional materials placed heavy emphasis on tax benefits; and 4) the promotional materials contained very little information about the economic benefits and risks. Mr. Tonna contacted GD&L and requested copies of their business records. On January 5, 1984, after receiving no response from GD&L, Mr. Tonna prepared a summons and served it on GD&L. GD&L did not comply with the summons. After a jury trial in June 1987, Mr. Laurins was convicted on charges of obstruction of justice and causing contempt of court *656 in connection with a summons enforcement action. On September 8, 1988, the Court of Appeals for the Ninth Circuit affirmed an unreported decision of the District Court. United States v. Laurins, 857 F.2d 529 (9th Cir. 1988).On September 30, 1985, the United States of America filed a complaint for injunction against GD&L, Mr. Laurins and other individuals associated with the promotion and sale of marine dry cargo containers by GD&L. On June 15, 1987, the U.S. District Court entered Findings of Fact, Conclusions of Law, and a Final Judgment of Permanent Injunction as to GD&L. In October 1985, Mr. Tonna solicited information about GD&L from some 91 container manufactures. None of the entities who responded reported manufacturing any containers for GD&L. Inquiries made by Mr. Tonna to shipping and leasing companies also failed to reveal that any containers were ever leased from GD&L or Co-op. A review by Mr. Tonna of the bank records of GD&L at the Bank of America and the Redwood Bank produced only one check written for a container purchase. Mr. Tonna also found that the major source of deposits to the GD&L account was from investors and that there was no income *657 from container leasing activities. A review by Mr. Tonna of the bank records of Co-op and AREIT similarly failed to reveal any record of container purchases or container lease income. OPINION Petitioners participated in the GD&L container purchase and leasing program and claimed Schedule C losses and investment tax credits purportedly flowing from their participation in the GD&L program. Petitioners now agree that the containers never existed and, consequently, they concede that they are not entitled to the investment credits and Schedule C losses claimed by them in connection with said container program. Accordingly, the only issues remaining are whether petitioners are liable for the various additions to tax and increased interest as discussed below, and whether petitioners are liable for the section 6673 penalty. Sections 6653(a) and 6653(a)(1), as applicable, impose additions to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2), in the years applicable, imposes *658 an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. For the purposes of these sections, negligence is the failure to use due care or to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed correct, and petitioners bear the burden of proving otherwise. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Bixby v. Commissioner , 58 T.C. 757, 791 (1972). The failure of petitioner to make a meaningful investigation beyond the promotional materials supplied by the sales people or to consult independent advisors was not reasonable or in keeping with the standard of the ordinarily prudent person. See LaVerne v. Commissioner, 94 T.C.637, 652-653 (1990). Here, petitioners *659 based their decisions to invest in the GD&L container program largely on GD&L's promotional materials and their discussions with TPA, the broker for the GD&L program. While petitioner Smith sought the advice of Douglas Maynard, an attorney with business and tax experience, Mr. Maynard testified that his advice was based on the information available in the promotional materials. Mr. Maynard also recommended an investigation by Mr. Smith into the background of the promoter and to ascertain the actual value of the containers involved in the GD&L program. Nevertheless, petitioner Smith admitted at trial that he never contacted anyone in the container leasing business to determine if they were aware of GD&L or Co-op. Nor did he inquire about the industry itself. Mr. Smith testified that as of the time of the trial his familiarity with the container leasing industry was still minimal. Although petitioner Smith contacted an unrelated container leasing company named Bay View Maritime, he simply inquired as to the company's rental rates and purchase prices in order to satisfy himself that the numbers quoted in the GD&L promotional materials were in the proper range. Petitioner Smith *660 claims that he contacted the Internal Revenue Service and the Better Business Bureau seeking information about both TPA and GD&L, but received no information, either negative or positive. He also claims to have spoken with Mr. Laurins and other GD&L representatives in an attempt to ascertain whether the program was in fact legitimate. The value of any assurances from these individuals concerning the merits of the container program would be singularly conjectural. Mrs. Weiler claims that she read the offering materials thoroughly. Yet she did not question TPA's recommendation of the container program to a person of her financial status (a net worth of some $ 20,000) even though the promotional materials emphasized that, in view of the substantial business and tax risks involved, GD&L would sell containers only to persons with a net worth of $ 100,000 or more who were able to evaluate and assume the risk of the purchase of containers. Moreover, Mrs. Weiler should have suspected the bona fides of her investment when she received the income and expense statements for the year ending December 31, 1983, showing identical income and expense amounts for her first container purchase on *661 September 28, 1983, and her second purchase on November 17, 1983. The structure of the GD&L container program would raise questions in the minds of ordinarily prudent investors. An investment of $ 100,000 in one unit in the container program required only a $ 5,000 cash payment (for which financing was available), with no obligation to sign a promissory note or security agreement to secure the $ 95,000 balance due on the investment. Yet, with this small initial outlay, the investors were assured of tax benefits over a period of years of more than four times the initial cash investment. We find that petitioners entered into the alleged transactions with little or no understanding of what they were doing. Petitioners showed little awareness of, or interest in, the contents of the offering materials other than the information on tax benefits. In spite of available information to the contrary, Mr. Smith believed that his containers would be rented at 100 percent utilization. Petitioners Weiler and Smith both testified that they knew GD&L and Co-op had entered the container leasing business only one or two years before, but that they were not concerned with the newness of the business. *662 Petitioners claimed that they analyzed the economic benefits and rejected other, more risky investment opportunities. The record does not support such a claim since GD&L's offering materials repeatedly disclosed that the program involved extraordinary economic risks. Moreover, once petitioners became investors they made no effort to ensure that they had any depreciable interest at all in the containers for which they claimed significant deductions. See Doyle v. Commissioner, T.C. Memo. 1989-465.The record clearly reflects petitioners' lack of concern for the economic aspects of the transaction. Petitioners did not register their containers with EORA or purchase insurance for the containers. Nor did they know whether the containers were insured by GD&L. In short, their actions show an absence of any diligent and good faith effort to investigate the soundness of the GD&L container program. On this record, we must conclude that petitioners are liable for the additions to tax under section 6653(a) and section 6653(a)(1) and (2). Section 6659(a) imposes a graduated addition *663 to tax on an underpayment of tax attributable to a valuation overstatement. A valuation overstatement exists if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the correct value. Sec. 6659(c). Respondent argues that our holding on this issue in Zirker v. Commissioner, 87 T.C. 970 (1986), is controlling here. We disagree. In Zirker, we disallowed depreciation deductions and an investment tax credit resulting from a purported investment by taxpayer in dairy cattle on the ground that the transaction was not a sale for Federal tax purposes in that the transaction was completely lacking in economic substance. Under such circumstances, the taxpayer had a zero basis in the asset sought to be depreciated and a valuation overstatement automatically ensued. In Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we distinguished Zirker. In Todd, the taxpayer actually purchased assets but did not place them in service in the year at issue. We concluded in that case that the consequence of determining that an asset was not placed in *664 service during the year in issue is to disallow all deductions and investment tax credit with respect to that asset. The same reasoning is applicable in the instant cases where the assets were not placed in service due to their nonexistence. See Chellappan v. Commissioner, T.C. Memo. 1988-208. It is axiomatic that to be entitled to a depreciation deduction, the taxpayer must have an investment or have an interest in depreciable property. Hunter v. Commissioner, 46 T.C. 477, 489-490 (1966); see also Law v. Commissioner, 84 T.C. 985, 993 (1985). The same considerations pertain to the investment tax credit. Here, the petitioners fully agree that the containers purportedly acquired in the program never existed. Consequently, petitioners acquired no depreciable interest in any property, and the disallowance of the investment tax credit and the depreciation deductions by the petitioners is not geared to statements of value as to adjusted basis on the returns for the years involved. In short, any claims of valuation and adjusted basis by *665 the petitioners are irrelevant. We conclude on this record that the additions to tax under section 6659 are not applicable to petitioners in these cases. Respondent, in the alternative, asserted an addition to tax in these cases under section 6661 for the taxable year 1983. Section 6661(a) imposes an addition to tax equal to 25 percent of any underpayment of income tax attributable to a substantial understatement. An understatement is defined as the excess of the amount of tax required to be shown on the tax return over the amount of tax actually shown on the return as filed less any rebates. A substantial understatement is one that exceeds the greater of either 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). The amount of the understatement may be reduced by an amount for which there was substantial authority for the treatment adopted by petitioners on their return. Sec. 6661(b)(2)(B)(i). This reduction is not available in the case of a tax shelter unless in addition the taxpayer reasonably believed that the claimed tax treatment was "more likely *666 than not" the proper tax treatment. Sec. 6661(b)(2)(C)(i)(II). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership or other entity or investment plan or arrangement or any other plan or arrangement the principal purpose of which is the avoidance or evasion of Federal income tax. Here, it is clear that the only purpose of the container program was the avoidance or evasion of Federal income tax. Petitioners agree that the containers never existed. The transaction was simply a sham. Petitioners have not shown that they reasonably believed that the tax treatment they claimed with respect to the non-existent containers was more likely than not the proper tax treatment. On the record, we must sustain respondent's determination of the addition to tax for the year 1983 under section 6661(a) with respect to both petitioners. Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6601 if there is a "substantial underpayment" (an underpayment which exceeds $ 1,000) in any taxable year attributable to one or more *667 "tax motivated transactions." The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Among the transactions enumerated in the statute as "tax motivated" is "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). Since we conclude on this record that the container program represented a factual sham, we hold that section 6621(c) is applicable. Respondent is sustained. Damages under Section 6673
Next we consider respondent's request for the imposition of the penalty under section 6673. That section provides for a penalty not to exceed a stated amount (now $ 25,000) to the United States when it appears to the Tax Court that proceedings before it have been instituted or maintained primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless. Respondent argues that such imposition of a penalty is appropriate here because *668 these cases involve blatant, highly leveraged tax shelter schemes. We do not absolve petitioners from their obligation to look behind the benefits promised in the offering materials. However, in the exercise of our discretion, and on this record, we decline to impose penalties in these cases. Future cases involving similarly situated taxpayers, however, may expect serious consideration of the application of the penalty provisions of section 6673. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert Smith and Janet Smith, docket No. 13026-87, and Beverly A. Weiler, docket No. 24423-88.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
**. To be determined.↩
*. 50 percent of the interest due on any underpayment attributable to negligence.↩
**. To be determined.↩
*. 50 percent of the interest due on any underpayment attributable to negligence.↩