Herman Schaevitz and Stella Schaevitz v. Commissioner.
Schaevitz v. Commissioner
Docket No. 2207-69.
United States Tax Court
T.C. Memo 1971-197; 1971 Tax Ct. Memo LEXIS 134; 30 T.C.M. (CCH) 823; T.C.M. (RIA) 71197; August 11, 1971, Filed. Daniel Mungall, Jr., 1300 Two Girard Plaza, Broad St. and South Penn. Sq., Philadelphia, Pa., for the petitioners. Giles J. McCarthy, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies of $13,997.60 and $2,016.05 in petitioners' income tax for the calendar years 1964 and 1965, respectively. The questions presented for decision are: (1) whether petitioners may deduct $13,600 as depreciation with respect to the yacht Reveille for the year 1964; (2) whether petitioners are entitled to an investment credit of $7,000 with respect to Reveille for the year 1964; and (3) whether petitioners may deduct a $9,620.17 loss which they claim was sustained by Reveille Corporation, a Subchapter S corporation wholly owned by petitioner Herman Schaevitz, in 1965. Findings of *136 Fact The parties have stipulated certain facts which are incorporated herein by this reference. Petitioners, Herman and Stella Schaevitz, are husband and wife. They filed joint Federal income tax returns for the calendar 824 years 1964 and 1965 with the district director of internal revenue at Newark, New Jersey, and resided in Collingswood, New Jersey, at the time the petition in this case was filed. At all times pertinent herein, they kept their books and filed their Federal income tax returns on a cash method of accounting and on a calendar year basis. Herman established Schaevitz Engineering, Inc. ("Schaevitz Engineering"), a New Jersey corporation, in 1945. Initially the corporation manufactured measurement and control devices. Subsequently it developed, manufactured, and sold a variety of other products, including centrifuges or rotary accelerators. The corporation has also had considerable experience in welding and working with metals. During 1964 and 1965 Herman was the president and principal shareholder of Schaevitz Engineering, holding between 82 and 83 percent of its outstanding stock. The remaining shares were publicly held by some 600 stockholders. The corporation *137 in turn was the sole owner of at least six subsidiaries, including Schaevitz Machine Works. During the years in issue Schaevitz Engineering and its subsidiaries manufactured measuring, indicating, recording, testing, and controlling devices used in electronic, mechanical, and hydraulic systems. Schaevitz Engineering had a 50,000 square foot plant located on 30 acres in Pennsauken, New Jersey. The plant had a fabrication shop, a machine shop, crane facilities, and cutting, shearing, and "vending" facilities suitable for work with metals. During the late 1950's and early 1960's the manufacture of rotary accelerators comprised a substantial part of Schaevitz Engineering's business. The success of this operation, however, was directly dependent upon Government orders. Consequently, Herman desired to move into other types of business which would not be so dependent upon one customer. Various product lines were investigated. During 1963 orders for rotary accelerators declined and it eventually became apparent that orders then on hand would provide work for the corporation's machine shop only through the end of 1963. By the end of 1963, Schaevitz Engineering's rotary accelerator business *138 had substantially died out. In late 1963 a group of persons (sometimes hereinafter referred to as the "Hunter group") approached Herman with a proposal that Schaevitz Engineering construct a large, metal-hulled, ocean sailing yacht. Kent Hunter ("Hunter"), a vice-president of Lavino Shipping Company, was the principal figure in the group. Some of the other members of the group were Horace Disston ("Disston"), also an employee of Lavino Shipping Company; Marlene Hunter, Kent Hunter's wife; Don Geraghty, an experienced sailor; Dick Clark, an employee of Reynolds Aluminum; and two naval architects and a marine engineer. Hunter and Disston had previously built one prototype of such a yacht. They had developed the idea in 1961 when they were both employees of Lavino Shipping Company. Both were involved with large-scale metal construction and both were interested in sailing and in boats. They thought that they could build a production sailing yacht which would be larger and relatively less expensive than anything else on the market at that time and hoped to establish a business to build such yachts to which they could devote their full time. The significant features of the yacht were *139 a retractable keel and construction largely of flat metal plates. The prototype built by Hunter and Disston was completed in the spring of 1962. They placed advertisements in 1963 issues of "The Skipper" magazine in an effort to interest potential buyers in ordering construction of such yachts, which they called "North Altantic 73s." The advertisements appeared over the name of "Hunter Ocean Yachts," a New Jersey corporation which Hunter and Disston organized on July 15, 1963. Nearly 1,000 persons responded to the advertisements. Each respondent was sent a brochure which described the prototype in greater detail. Approximately 15 to 20 persons came to inspect or sail on the prototype in 1963. Among the visitors was Herman who inspected the yacht in the spring of 1963 but expressed no further interest at that time. Hunter and Disston were unable to procure any orders for additional North Atlantic 73s. The prototype had a steel hull, and Hunter and Disston concluded that its weight and tendency to rust might have discouraged potential customers. They decided that a second prototype should be built with an aluminum hull and which would consequently have more appeal as a racing boat.
*140 In the fall of 1963 Hunter and Disston contacted Herman on behalf of the Hunter group in an effort to interest him or his corporations in their venture. They proposed that another prototype with an 825 aluminum hull be built and that Hunter Ocean Yachts be continued in existence for another six months to a year to handle the advertising for the North Atlantic 73s. They showed Herman the advertisements they had placed and the responses which they had received. Herman was impressed with the design of the boat and with Hunter's ability. Moreover, because of the decline in its rotary accelerator business, Schaevitz Engineering needed metal work to keep its fabrication shop busy. Herman concluded that a profitable commercial enterprise was possible and decided to join the venture. He contemplated that North Atlantic 73s would be built and sold in quantity and would yield a large return per unit. He also expected that the venture would provide the opportunity to develop equipment which could be manufactured for the boating industry as a whole. Discussions betwen Herman and the Hunter group lasted for about three weeks to one month. Eventually they reached an understanding that the *141 Hunter group would supply the design and know-how for the new prototype and that Schaevitz Engineering would finance and build it. Subsequently a written "memorandum," dated January 7, 1964, between Hunter Ocean Yachts and Hunter, on the one hand, and Schaevitz Engineering on the other, was executed by Hunter and by Herman. The memorandum reflected the basic understanding that had been reached during the preceding discussions: January 7, 1964 This memorandum will serve as a preliminary contract between Hunter Ocean Yachts and Kent Hunter, hereinafter referred to as Hunter, and Schaevitz Engineering, hereinafter referred to as Schaevitz. It is agreed that a new company, to be named Schaevitz-Hunter, Inc., will be formed, in as soon a time as practical. Schaevitz-Hunter will have as its purpose among others the fabrication of aluminum yachts, both power and sail and, if proven practical, the manufacture of ocean yacht hardware. Hunter agrees that all know-how, patents, patent rights, personal connections in the yachting field and all other related items will become the exclusive property of Schaevitz-Hunter. Hunter also agrees that they will supply all administrative work *142 necessary for the furthering of Schaevitz-Hunter at no cost until profits allow the payment of salaries, and that they will supply all the necessary administrative personnel for future operations. Schaevitz agrees to make funds available to build and operate for a minimum of one year a Racer version of the North Atlantic 73. The title to this Racer to remain with Schaevitz until double the cost of the Racer has been returned to Schaevitz. Schaevitz to supply the necessary facilities to build said Racer. Schaevitz to supply at 6% annual interest a reasonable amount of working capital, not to exceed $100,000, for the manufacture of other yachts, but only on the basis of firm orders. All other dealings between Schaevitz and Schaevitz-Hunter to be on a sound business basis. Schaevitz to own 50% of all common and preferred stock, and Hunter to own the other 50% of all common and preferred stock of Schaevitz-Hunter. SEAL /s/ Herman Schaevitz Herman Schaevitz SEAL /s/ Kent Hunter Kent Hunter Subsequently, however, the board of directors of Schaevitz Engineering decided that it would be undesirable for the name "Schaevitz" to be used in this connection and a corporation *143 by the name of "Schaevitz-Hunter, Inc." was never in fact incorporated. Herman and the members of the Hunter group considered one of the advantages of the North Atlantic 73 to be its retractable keel which would give it superior sailing speed before the wind. They decided that the best way to publicize the yacht would be by entering and winning yachting races. Indeed, even before construction of the prototype had begun, they decided that because of the importance of the Bermuda Race in yachting circles, they would enter the new prototype in that race. Consequently they planned the construction of the yacht so that it would be completed in time to enter the race which was to be held on or about June 20, 1964. Work on the new prototype, to be known as Reveille, began in early 1964. At this time a number of steps were taken at the Schaevitz Engineering plant to manufacture North Atlantic 73s in quantity. For example, extrusions, or dies, to be used to make the aluminum hull and other metal parts of the yacht, were purchased. The cost of building a single yacht with extrusions was greater than the cost of building a yacht without such devices. The extrusions were purchased only because *144 the manufacture of yachts in quantity was anticipated. 826 Advertising of the North Atlantic 73 was resumed in January of 1964. Monthly advertisements were placed in issues of "Yachting" and "The Skipper" magazines. Another promotional brochure was prepared in January of 1964. The Hunter group was primarily responsible for preparing and placing the advertisements and for handling the responses to them. Although a corporation by the name of "Schaevitz-Hunter, Inc.", was never incorporated, both the brochure and advertisements placed in issues of "Yachting" and "The Skipper" in March through May of 1964 bore the name "Schaevitz-Hunter." At some time during 1964, it was decided to name the proposed new corporation "Hunter Ocean Yachts" instead of "Schaevitz-hunter, Inc." Since the corporation which the Hunter group had organized in 1963 already bore the name of "Hunter Ocean Yachts," the name of that corporation was changed to Marken Corporation on May 27, 1964. The record does not clearly disclose whether a second "Hunter Ocean Yachts" corporation was ever incorporated thereafter. However, advertisements in "Yachting" magazine, beginning with the June, 1964, issue, used the *145 name "Hunter Ocean Yachts" rather than that of "Schaevitz-Hunter." While Schaevitz Engineering paid for the construction of Reveille, the yacht was actually built by its wholly-owned subsidiary, Schaevitz Machine Works. As of the time of the trial herein, Reveille was the only vessel ever constructed by Schaevitz Engineering and/or one of its subsidiaries. An invoice of Schaevitz Machine Works, dated June 9, 1964, recited that Reveille was "sold" to "Hunter Ocean Yachts" for $100,000. At the time the invoice was prepared, Schaevitz Machine Works credited sales and debited "accounts receivable - Hunter Ocean Yachts, Inc." in the amount of $100,000. In accordance with the memorandum of January 7, 1964, Herman contemplated that Hunter Ocean Yachts would operate Reveille but not own it until it had paid the entire $100,000. Reveille was placed in the water in early June, 1964. With the exception of some minor fittings, its construction was completed at that time. A professional skipper was hired for the Bermuda Race. However, after the vessel developed a leak and it became apparent that the crew was not sufficiently trained, Reveille did not participate in the race. Shortly after *146 the failure to participate in the Bermuda Race, on or about June 20, 1964, the members of the Hunter group lost much of their enthusiasm for the venture. As a result, the contemplated "new" Hunter Ocean Yachts corporation did not become an actively operating corporation. Herman became concerned that the reputation of Schaevitz Engineering would be impaired because it (or its wholly-owned subsidiary) [1] was carrying an account receivable from Hunter Ocean Yachts for construction of Reveille with seemingly little chance of being paid. With this in mind, Herman made a series of payments to Schaevitz Engineering beginning in July, 1964. The payments were reflected by the following trial balances in the account for "loans payable - Herman Schaevitz" on the books of Schaevitz Engineering: 1964
Debit
Credit
June 30
-0-
-0-
July 31
$41,250.00
August 31
46,250.00
September 30
83,850.00
October 31
84,750.00
November 30
90,250.00
December 31
86,500.00
1965:
January 31
84,339.00
February 28
85,339.00
March 31
$7,661.00
-0-
*147 On March 31, 1965, a journal entry was made in the books of Schaevitz Engineering crediting its account, "accounts receivable - Hunter Ocean Yachts," in the amount of $100,000 and debiting the account for "loans payable - Herman Schaevitz." After failing to participate in the Bermuda Race, Herman and the Hunter group decided to enter Reveille in other races in an effort to generate what publicity they could from the yacht's performance there. During the summer Reveille competed in a number of races in the vicinity of Long Island Sound. Hunter organized a group of people from the New York area to serve as crew, along with members of the original Bermuda Race crew. Hunter, Disston, and Howard Schaevitz, Herman's son, were generally aboard during those races. 827 Monthly advertisements for North Atlantic 73s continued to be placed in "Yachting" under the name of Hunter Ocean Yachts through September of 1964. Responses to such advertisements were received throughout 1964 and into 1965. At least until the end of 1964 Hunter continued to be responsible for handling such correspondence. In conducting such correspondence with prospective customers Hunter sent out brochures as well *148 as specific replies to more detailed inquiries. A number of prospective buyers were taken out on Reveille in the summer and fall of 1964, but no sales were made. On September 10, 1964, Reveille Corporation was incorporated under the laws of the State of New Jersey. Herman was its sole stockholder during 1964 and 1965. It made a timely election to be taxed as a small business corporation for the taxable year 1965. The minutes of a special meeting of the stockholders of Reveille Corporation, held on December 28, 1964, report the following: Mr. Herman Schaevitz introduced to the meeting a copy of a proposed contract to be signed later in the day by Reveille Corporation and various parties, forming a partnership known as Hunter Ocean Yachts, together with a corporation entitled Hunter Ocean Yachts, Inc., the purpose of which contract was to provide for Hunter Ocean Yachts, Inc. to engage in advertising and other promotional activities aimed at selling yachts of which the vessel "Reveille," proposed to be turned over to the corporation, would be the prototype. Upon a review thereof, the contract was unanimously approved and Herman Schaevitz was authorized to execute the said contract *149 on behalf of the corporation. Herman Schaevitz then pointed out to the meeting that the yacht "Reveille" had been manufactured by Schaevitz Machine Works, a corporation of the State of New Jersey, which is a subsidiary of Schaevitz Engineering, of which Herman Schaevitz is the principal stockholder. He explained to the meeting that this yacht had originally been registered in the name of Hunter Ocean Yachts, Inc. in the expectation that that corporation would own the yacht and perform all functions relative to its manufacture and sale but that because of the unwillingness of the Hunter organization to inject fresh capital into the venture, and further because of certain problems felt by the members of the Hunter organization, that the Hunter organization had requested that the original arrangement so contemplated be altered, and that instead of that, Reveille Corporation own the yacht and perform those functions in relation to it indicated in the agreement. Mr. Schaevitz explained further that Schaevitz Engineering through its subsidiary, Schaevitz Machine Works, had originally billed Hunter Ocean Yachts for the construction of the vessel and that it was now contemplated that Reveille *150 Corporation assume the said obligation to complete the payment on the vessel (a portion of which had already been paid by Herman Schaevitz) for the remainder of the payments. Upon motion duly made and seconded, it was unanimously RESOLVED, that the corporation assume the obligation presently held by Hunter Ocean Yachts, Inc. to complete the payments on the yacht "Reveille" to be made to Schaevitz Machine Works and/or Schaevitz Engineering as might be directed by Schaevitz Machine Works, or its successor, in interest, and further that the corporation and its directors be authorized to take such steps as might be necessary to obtain the transfer of the yacht "Reveille" from the registration of Hunter Ocean Yachts, Inc. to registration in the name of Reveille Corporation. The proposed contract referred to in the minutes was dated December 28, 1964. Its introductory provisions stated in part: AGREEMENT THIS AGREEMENT made this 28th day of December, 1964, by and between HERMAN SCHAEVITZ (hereinafter called "Schaevitz"), SCHAEVITZ MACHINE WORKS, a New Jersey corporation (hereinafter called "S.M.W."), REVEILLE CORPORATION, a New Jersey corporation (hereinafter called "Reveille"), *151 HUNTER OCEAN YACHTS, a New Jersey corporation (hereinafter called "H.O.Y."); KENT HUNTER, MARLENE HUNTER, LAWRENCE M. HUNTER, HORACE C. DISSTON, (hereinafter called "Disston"), JOHN MENDOLIA (hereinafter called "Mendolia"), and GLEN W. WILEY (hereinafter called "Wiley"), individually and collectively trading as Hunter Ocean Yachts, a New Jersey partnership (hereinafter known as "The Partnership"). WITNESSETH: WHEREAS, Kent Hunter, Marlene Hunter, Lawrence M. Hunter, Disston, Mendolia, and Wiley trading as Hunter Ocean Yachts are owners of a 73-foot sloop known as the "North Atlantic 73;" and 828 WHEREAS, Schaevitz has obtained a right to purchase from S.M.W. a 73foot sloop known as the "Reveille" for which the North Atlantic 73 was the prototype; and WHEREAS, Schaevitz has assigned his right to purchase the Reveille to Reveille; and WHEREAS, it is contemplated that H.O.Y. shall own and sell both on its own behalf and on commission for The Partnership and Reveille and otherwise deal in sailing and/or powered vessels of a welded construction similar to that used in the construction of the North Atlantic 73 and the Reveille; and WHEREAS, it is contemplated that S.M.W. *152 will have the exclusive right to manufacture and construct vessels on behalf of H.O.Y., and none of the other parties hereto shall engage in the exploitation in any way of such vessels except through H.O.Y.; * * * One copy of the proposed contract was signed by Kent Hunter, Marlene Hunter, and Disston. However, Herman never reached a final agreement with the Hunter group and did not sign the contract. On May 22, 1964, an insurance policy covering Reveille for the period May 22, 1964, to May 22, 1965, was issued by the Home Insurance Company. The named insured in the policy was Schaevitz Engineering. The policy included the following provisions relating to the use and ownership of the yacht: Private Pleasure Warranty. Warranted to be used solely for private pleasure purposes and not to be hired or chartered unless approved by this Company and permission endorsed hereon. Transfer of Ownership. This insurance shall be void in case of transfer of ownership of the property insured by this policy without the previous consent in writing of this Company. By an endorsement dated effective August 13, 1964, the named insured was amended to read: "Schaevitz Machine Works, Hunter Ocean *153 Yachts, Inc. and Reveille Corp." Renewal insurance policies covering Reveille for the period May 22, 1965 to May 22, 1966 and May 22, 1966 to May 22, 1967, listed as the named insured: "Reveille Corp., Hunter Ocean Yachts, Inc., Schaevitz Engineering and Herman Schaevitz." These policies included provisions relating to use and ownership of the yacht which were similar to those contained in the first policy. By the beginning of 1965 Hunter had dropped out of the venture. At some time in late 1964 or early 1965 title to Reveille was transferred to Reveille Corporation; the yacht was the corporation's sole asset. At about this time Herman concluded that he would probably be unable to sell North Atlantic 73s, that Reveille was an "albatross" around his neck, and that the yacht ought to be sold as quickly as possible. He placed his son, Howard, in charge of the yacht. Howard agreed to organize a group of people to keep the yacht in operating condition until it could be sold. Howard got together a group of approximately 15 people to work on Reveille during weekends from February through August of 1965. These individuals were not paid but were permitted to sail Reveille in return for their *154 services. In the spring of 1965 Howard listed Reveille with several yacht brokers at an asking price of $100,000. Efforts to sell the yacht through brokers and directly with a number of prospective buyers continued through 1965 and until Reveille sank in 1968. In May of 1965 an individual inquired about chartering Reveille in Maine for the summer. The offer was declined, however, on the ground that it would be difficult for prospective buyers to inspect the yacht if it were in Maine for the summer. Late in the summer of 1965, Reveille was chartered on three occasions in return for total payments of $637.69. There were approximately six charters in 1966 and an undisclosed number of charters in 1967. Reveille sank in May 1968, while on an extended six-month charter. At that time several other charters had already been arranged for the summer of 1968. Reveille was chartered in order to obtain sufficient cash to maintain the yacht while it was being held for sale. From at least early 1965 the dominant and overriding objective held by Herman and his son was to sell Reveille and get out of the boat business. Although they were asking $100,000 for Reveille, they would have accepted an *155 offer of a lower figure "rather quickly." Herman suffered from "seasickness" and was not a sailor. He did not go out on Reveille more than three time during its existence. Prior to 1964 Howard had some sailing experience with small boats, but not with a yacht of the size of Reveille. He "crewed" in the races which Reveille 829 entered in the summer of 1964 and was in charge of the yacht from early 1965 until it sank in 1968. On their joint Federal income tax return for 1964 petitioners reported the following with respect to the yacht Reveille: 04,00,14,15,14
Part II - Rent and Royalty Income
Kind and Location
Total Amount
of Property
of Rents
Depreciation
Amount
Boat
$ 9,600.00
Additional 1st year depreciation
4,000.00
The boat was on a net lease to Hunter
Ocean Yacht, Inc. who uses boat as a demon-
strator. No payments were made under this
lease for 1964.
Totals
$13,600.00
($13,600.00)
Part IV - Schedule For Depreciation
Date
Method of Depre-
Depreciation
Description of Property
Cost
Acquired
ciation Rate
For Year
Boat - North Atlantic 73
$100,000
6/9/54
Less additional 1st year depreciation 4,000 DDB 10%
$9,600.00
Basis
$ 96,000
6/9/64
$4,000.00
Additional 1st year depreciation (20% of $20,000)
Boat was purchased from Schaevitz Machine Works on 6/9/64
*156 The record contains no evidence of a net lease of Reveille by Herman to Hunter Ocean Yachts in 1964. On their 1964 return petitioners also claimed an investment credit of $7,000 with respect to the yacht. On its U.S. Small Business Corporation Return of Income for the calendar year 1965, Reveille Corporation reported the following as income, deductions, and taxable income: Gross Income:
Gross Receipts $637.69
Total Income $637.69
Deductions:
Insurance
$ 1,352.00
Taxes (N.J. Franchise)
76.66
Depreciation
8,640.00
Bank Charges
2.20
Miscellaneous 187.00
Total Deductions $10,257.86
Taxable Income
[9,620.17) The return disclosed the following with respect to the claimed depreciation deduction of $8,640: Description of Property
Boat
Date Acquired
1964
Cost
$86,400.00
Method of depreciation
Straight Line
Rate
10%
Depreciation for this year
$8,640.00 On their joint Federal income tax return for 1965, petitioners claimed a loss of $9,620.17 attributable to the net operating loss of Reveille Corporation. In his notice of deficiency, the Commissioner determined: (a) * * * the boat "Reveille" identified *157 on your return as "NO. ATLAN. 73" acquired in 1964, is a personal asset. Accordingly, depreciation claimed by you of $13,600.00 for the year 1964 is not allowable because it is a nondeductible personal expense under section 262 of the Internal Revenue Code, or, if not a personal asset, you have failed to establish such property was used in a trade or business or in the production of income. (b) You have failed to establish that Reveille Corporation, for which a timely election to be taxed as a small business corporation was filed, was operated as a business for profit during 1965. Accordingly, you are not entitled to the distributable loss of $9,620.17 from Reveille Corporation claimed by you for the year 1965 under section 165(c) of the Internal Revenue Code. * * * It is determined that the investment credit of $7,000.00 claimed by you for the year 1964 with respect to the boat "Reveille" is not allowed because the property is a personal asset and it was not placed in service in connection with a trade or business or in the production of income during such year. Opinion RAUM, Judge: 1. Depreciation deduction. The Commissioner's *158 position is that petitioners are not entitled to a deduction for depreciation with respect to Reveille on the ground that they did not own the yacht 830 in 1964 and, alternatively, on the ground that in 1964 they were not engaged in a trade or business and did not hold Reveille for the production of income. [2] We sustain the Commissioner's determination on the basis of the first argument. Petitioners have urged that in his deficiency notice the Commissioner did not raise the question of whether petitioners held an interest in Reveille sufficient to entitle them to a depreciation deduction and that therefore he may not raise this issue now. In his deficiency notice to petitioners, the Commissioner determined that: *159 (a) * * * the boat "Reveille" identified on your return as "NO. ATLAN. 73" acquired in 1964, is a personal asset. Accordingly, depreciation claimed by you of $13,600.00 for the year 1964 is not allowable because it is a nondeductible personal expense under section 262 of the Internal Revenue Code, or, if not a personal asset, you have failed to establish such property was used in a trade or business or in the production of income. While it may be argued that the matter of ownership of the boat was not explicitly raised by the notice of deficiency, it is nevertheless clear that the notice disallowing the depreciation deduction was broadly based and that it is an essential ingredient of a claim to such deduction that the taxpayer must have a depreciable interest in the asset involved. Moreover, the history of the boat was fully explored at the trial and dealt with in the stipulated materials, tracing its construction and financing as well as rights of ownership therein to the extent that evidence with respect to such matters was available. At the conclusion of the trial Government counsel stated: "If there's any question in [petitioners' counsel's] * * * *160 mind that he's been misled by the statutory notice, I would be more than happy, with the permission of the Court, if your leave were so granted, to amend the pleadings to conform to the proof." The Court thereupon indicated that such an amendment would not be necessary, and petitioners' counsel did not object. We hold that the matter of ownership of the boat is properly before us in the light of the foregoing, and the rule is in any event well established that a deficiency may be approved on grounds other than those advanced by the Commissioner or even where the grounds relied upon by him may be incorrect. [3]
*161 In order to be entitled to a deduction for depreciation under section 167, petitioners must demonstrate that they had an investment in Reveille. See Commissioner v. Revere Land Co., 169 F. 2d 469, 476 (C.A. 3), reversing 7 T.C. 1061, certiorari denied, 355 U.S. 853; Robert L. Hunter, 46 T.C. 477, 489-490. Moreover, as we stated in Robert L. Hunter, supra, at 490: Ownership of the property is usually required, but the existence of bare legal title in another does not always depreive the taxpayer of a depreciation deduction if it is shown that the taxpayer in fact is the one who suffers the economic loss of his investment by virtue of the wear and tear or exhaustion of the property. But the loss to the taxpayer must be a present one, not just a possibility, and it must relate to taxpayer's investment in the property. Weiss v. Wiener, 279 U.S. 333. Consequently, a stockholder is not usually entitled to a depreciation deduction for property owned by his corporation because he has no direct economic interest *162 or investment in the property. Fleming G. Railey, 36 B.T.A. 543. Under normal circumstances the corporate entity will not be ignored. Moline Properties v. Commissioner, 319 U.S. 436; Skarda v. Commissioner, 250 F. 2d 429 (C.A. 10, 1957), affirming 27 T.C. 137. Where the corporation is the owner of the property and uses it in its business, 831 the corporation, not the stockholders, is entitled to the depreciation deduction. Cf. Ernest L. Rink 51 T.C. 746, 752-753. In our judgment the record fails to establish that Mr. Schaevitz, individu had any depreciable interest in Reveille during 1964, and the weight of the evidence strongly supports the conclusion that he had none. We note in particular the following. a. The parties appear to agree that at least through May of 1964, Reveille was owned either by Schaevitz Engineering, the corporation which financed its construction, or by Schaevitz Machine Works, a whollyowned subsidiary of Schaevitz Engineering which built Reveille. In May of 1964 an insurance policy was issued covering Reveille and naming Schaevitz Engineering as the insured. In June of 1964, an *163 invoice of Schaevitz Machine Works was prepared which recited that Reveille was "sold" to Hunter Ocean Yachts for $100,000, and a $100,000 account receivable in the name of Hunter Ocean Yachts, Inc. was entered on the books of Schaevitz Machine Works. Although the record indicates that Hunter Ocean Yachts never became an "actively operating" corporation, the evidence fails to show that it was never incorporated or that the foregoing invoice and account receivable did not accurately describe the matters reflected therein. As of December 31, 1964, the books and records of Schaevitz Engineering and Schaevitz Machine Works were consolidated, and the $100,000 account receivable of Hunter Ocean Yachts, Inc. was carried on the books of Schaevitz Engineering until March, 1965. b. In August of 1964 the insurance policy covering Reveille was amended to name as the insured: Schaevitz Machine Works, Hunter Ocean Yachts, Inc., and Reveille Corporation. c. The minutes of a special meeting of the stockholders of Reveille Corporation, held on December 28, 1964, report the adoption of a resolution authorizing the assumption of the "obligation presently held by Hunter Ocean Yachts, Inc." for the *164 yacht and authorizing its directors to have the registration of the yacht transferred from the name of Hunter Ocean Yachts to Reveille Corporation. d. A proposed but unexecuted agreement among various participants in the yacht venture, dated December 31, 1964, declared that Herman had obtained a "right to purchase" the yacht and had assigned that right to Reveille Corporation. Reveille Corporation's 1965 U.S. Small Business Corporation Return of Income reported that the corporation acquired Reveille in 1964. The foregoing strongly suggests that petitioner did not obtain a depreciable interest in Reveille during 1964. However, petitioners have urged that Herman's payments to Schaevitz Engineering beginning in July, 1964, gave him such an interest. We disagree. The record does not adequately demonstrate to us that Herman's payments were designed to give him any interest in Reveille whatever. Indeed, his primary objective in making the payments appears to have been simply to eliminate the $100,000 account receivable from his corporation's books. It is notable that the insurance policy and the records of Reveille Corporation described above make no mention of Herman's alleged interest *165 in Reveille. Only the unexecuted contract, dated December 28, 1964, refers to Herman's possession of a "right to purchase" the yacht. The existence of such an option finds support nowhere else in the record. Moreover, it is highly significant that while it was originally understood that Hunter Ocean Yachts would not own Reveille until it had fully paid Schaevitz Engineering for the yacht, Herman did not make all of such payments during 1964, and the $100,000 account receivable was carried on the books of Schaevitz Engineering until March of 1965. Finally, the payments made by him were reflected on the books of Schaevitz Engineering ina "loans payable - Herman Schaevitz" account, thus indicating that such payments were being treated merely as advances or loans by him to the corporation, rather than installments comprising a purchase price for the boat. We conclude on this record that Herman did not have a depreciable interest in Reveille. Cf. Commissioner v. Revere Land Co., supra, 169 F. 2d at 476. [4]
*166 832 2. Investment Credit. Petitioners have contended that they are entitled to an investment credit in 1964 with respect to Reveille on the ground that the yacht was tangible personal property which was depreciable and had a useful life of four years or more. See sections 38, 46, and 48, I.R.C. 1954. [5] In view of our decision above that petitioners did not hold a depreciable interest in Reveille in 1964 their argument must be rejected. *167 3. Net operating loss. On their 1965 income tax return petitioners claimed a loss of $9,620.17 attributable to Reveille Corporation which had made a timely election to be taxed as a small business corporation. Reveille was the corporation's principal asset, and the primary item contributing to the claimed loss was a depreciation deduction of $8,640, claimed with respect to Reveille. The Commissioner determined that petitioners had failed to establish that Reveille Corporation "was operated as a business for profit during 1965" and that the loss was therefore not deductible under section 165(c), I.R.C. 1954. Section 165 provides in part as follows: SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, *168 though not connected with a trade or business * * *. We think that Reveille Corporation conducted a trade or business during 1965 and that its loss is deductible by petitioners. [6]
*169 833 We note at the outset that Reveille was built in 1964 as a prototype for yachts which were to be promoted, manufactured, and sold at a profit by a venture to be organized by Herman and the Hunter group. This is therefore not a case involving a yacht originally held for personal purposes which is subsequently put up for rent or sale. Cases denying loss deductions in such circumstances are therefore of little relevance here. Compare Estelle G. Marx, 5 T.C. 173, with Ernest H. Martin, 50 T.C. 341, 364-365; cf. May v. Commissioner, 299 F. 2d 725 (C.A. 4), affirming 35 T.C. 865. [7]
When Reveille Corporation acquired the yacht in late 1964 or early 1965, Herman was resigned to the fact that the venture with the Hunter group would not succeed. But his overriding concern was to sell Reveille. The yacht was listed for sale with several brokers in 1965 and efforts were made to sell it both through brokers and directly to prospective customers from 1965 through May of 1968. Moreover, during each of these years Reveille was chartered *170 to others. On the basis of the foregoing activities, we conclude that during 1965 Reveille was used in a trade or business within the meaning of section 165(c)(1). See Anders I. Lagreide, 23 T.C. 508, 511-512; Leland Hazard, 7 T.C. 372; John D. Fackler, 45 B.T.A. 708, 714, affirmed 133 F. 2d 509 (C.A. 6); cf. Heiner v. Tindle, 276 U.S. 582; Andrew F. McBride, Jr., 50 T.C. 1, 7-9; Clarence B. Jones, 22 T.C. 407, 413-415, acq. 1954-2 C.B.4, reversed on another issue, 222 F. 2d 891 (C.A. 7); Estelle G. Marx, 5 T.C. 173. The Commissioner has emphasized that Reveille was not chartered until late in the summer of 1965 However, chartering it in the early months of 1965 may well have been impractical in the New Jersey area. Cf. Clarence B. Jones, supra, 22 T.C. at 414. Moreover, one offer for a charter was turned down in May of 1965 on the ground that it would have interfered with efforts to have the yacht sold. Cf. Frank A. Newcombe, 54 T.C. 1298, 1301. We think that the Commissioner erred in denying petitioners the deduction of the *171 loss of Reveille Corporation in 1965. Decision will be entered under Rule 50. Footnotes
1. As of December 31, 1964, the books and records of Schaevitz Engineering and Schaevitz Machine Works were consolidated.↩
2. See section 167(a), I.R.C. 1954: SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩
3. See Sol Diamond, 56 T.C. -, -; Wilkes-Barre Carriage Co., 39 T.C. 839, 845-846, affirmed 332 F. 2d 421 (C.A. 2); Blansett v. United States, 283 F. 2d 474, 478-479 (C.A. 8); Bernstein v. Commissioner, 267 F. 2d 879, 881-882 (C.A. 5); Acer Realty Co. v. Commissioner, 132 F. 2d 512, 514-515 (C.A. 8); Alexander Sprunt & Son v. Commissioner, 64 F. 2d 424, 427 (C.A. 4); Crowell v. Commissioner, 62 F. 2d 51, 53 (C.A. 6); J. & O. Altschul Tobacco Co.v. Commissioner, 42 F. 2d 609, 610 (C.A. 5); Hughes v. Commissioner, 38 F. 2d 755, 757 (C.A. 10); John L. Chipley, 25 B.T.A. 1103, 1106; Edgar M. Carnrick, 21 B.T.A. 12, 21; cf. Helvering v. Rankin, 295 U.S. 123, 132-133↩.
4. In Revere Land Co., the Court of Appeals stated: A mere "contribution" is not sufficient by and of itself to give Revere a depreciable interest in the Grant Building under the statute. In order for Revere to enjoy a depreciable interest in the Grant Building it was required to establish the fact that its contribution was made on such terms and conditions as to give it an investment status in the project. There is no evidence in the record to indicate that such was the intent of the parties. Revere by virtue of its "contribution" was not to share in the profits or losses of the operation of the Grant Building. It was not given any right, title, interest or control in or over the building by virtue of its contribution. The record is devoid of any evidence demonstrating that Revere considered itself as embarking upon a joint venture with Grant. * * * * * * While such an unqualified contribution would result in a corresponding reduction of the recipient's depreciable interest, that does not mean that the contributor, merely because of his contribution, attains or is invested with a depreciable interest.↩
5. SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY. (a) General Rule. - There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part. SEC. 46. AMOUNT OF CREDIT. * * * (c) Qualified Investment. - (1) In General. - For purposes of this subpart, the term "qualified investment" means, with respect to any taxable year, the aggregate of - (A) the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year, plus (B) the applicable percentage of the cost of each used section 38 property (as defined in section 48(c)(1)) placed in service by the taxpayer during such taxable year. SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. - (1) In General. - Except as provided in this subsection, the term "section 38 property" means - (A) tangible personal property * * * * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.↩
6. Although the controversy between the parties has focused upon section 165(c), we note that additional support for petitioners' position is provided by section 1374, I.R.C. 1954, which provides in part: SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. (a) General Rule. - A net operating loss ofan electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) Allowance of Deduction. - Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)). * * * (d) Application With Other Provisions. - (1) In general. - The deduction allowed by subsection (b) shall, for purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder. Also, section 167(a), authorizing the depreciation deduction which was the primary item contributing to Reveille Corporation's loss, imposes requirements analogous to those included in section 165(c): SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. The conclusion that Reveille was used ina trade or business within the meaning of section 165(c)↩ thus would also support Reveille Corporation's claim to the depreciation deduction.
7. Cf. Theodore H. Cowles, Jr., 29 T.C.M. 884↩, 885, P-H Memo. 70-970, 70-971.