SELLAMUTHU G. CHELLAPPAN AND HILDA J. CHELLAPPAN, ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Chellappan v. CommissionerDocket Nos. 1514-86; 8910-86; 25731-86; 5103-87.United States Tax CourtT.C. Memo 1988-208; 1988 Tax Ct. Memo LEXIS 235; 55 T.C.M. (CCH) 826; T.C.M. (RIA) 88208; May 10, 1988. *235 Machines which petitioners thought they were purchasing under installment sales contracts did not exist. Fraud was perpetrated upon petitioners by seller. Held: transactions were factual shams, investment tax credits, depreciation and expenses not allowable. Held further, petitioners are not liable for negligence additions. Held further, petitioners are not subject to section 6659 additions. Todd v. Commissioner,89 T.C. 912 (1987). Held further,section 6621(c) addition sustained. Patin v. Commissioner,88 T.C. 1086 (1987). Dale R. Baringer, for the petitioners. Diane D. Helfgott, for the respondent. WHITAKERMEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies and additions to tax with respect to the individual income tax liability of each of the four sets of taxpayers involved in this case as follows:Sellamuthu G. Chellappan and Hilda J. Chellappan, Docket No. 1514-86Additions to TaxSectionSectionSectionYear EndedDeficiences6653(a)(1) 26653(a)(2)665912-31-83$ 5,929.00$ 1,778.7050 interest$ 1,778.70due on $ 5,292.0021-31-841,877.0093.8550 of interest563.10due on $ 1,877.00SectionYear Ended6621(c) 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-31-84**236 William G. and Reba C. Day, Docket No. 8910-86Additions to TaxSectionSectionSectionYear EndedDeficiences6653(a)(1)6653(a)(2)665912-31-78$ 17,388.00$   869.40----12-31-8121,468.001,073.4050 of interest$ 4,804.00due on $ 21,46812-31-8216,143.00807.1550% of interest4,641.90due on $ 16,143SectionYear Ended6621(c) 312-31-78**237 12-31-8112-31-82Lawrence Dauphine and Sybil Dauphine, Docket No. 25731-86Additions to TaxSectionSectionSectionYear EndedDeficiences6653(a)(1)6653(a)(2)665912-31-79$   770.00$  38.5050% of interestdue on $ 770.0012-31-815,215.00260.7550% of interest$ 526.50 4due on $ 5,215.0012-31-82515.0025.7550% of interestdue on $ 515.00SectionYear Ended6621(c)12-31-79*12-31-81*12-31-82*Tupie C. Henry and Isabel B. Henry, Docket No. 5103-87Additions to TaxSectionSectionSectionYear EndedDeficiences6653(a)(1)6653(a)(2)665912-31-83$ 9,240.00$ 462.0050 of interest$ 2,772.00due on $ 9,240.0012-31-843,277.00163.8550% of interest826.50due on $ 3,277.00SectionYear Ended6621(c)12-31-83*12-31-84*As a result of concessions by petitioners Day with respect to their taxable years 1981 and 1982, the sole issue for decision in each of these dockets, other than the additions to tax, is the propriety of investment tax credits and Schedule C expenses for depreciation, interest, and maintenance and management fees with respect to investments by each set of petitioners in photocopying machines modified for sublimation process use, by which designs may be transferred to textiles, wood and metals. 5 For the reasons indicated *238 in the opinion we hold that, unknown to petitioners, the purchases of these machines from the Magna Print Company, Inc. (Magna Print) were never consummated due to the fraud perpetrated upon petitioners by Magna Print and the transactions must be treated as shams for tax purposes. The several petitioners were innocent victims. Accordingly, we do not reach many of the issues raised by the parties. 6*239 Background Facts At the time of the filing of their respective petitions in this case, petitioners Chellappan and Day resided in Baton Rouge, Louisiana, petitioners Dauphine resided in Baker, Louisiana, and petitioners Henry resided in Pride, Louisiana. Each set of petitioners filed joint Federal income tax returns for each of the years here involved. The investments in the machines were made by Dauphine and Day in 1981 and by Chellappan and Henry in 1983. Magna Print Background Magna Print was incorporated in the District of Columbia on August 8, 1980, by John Sattelmaier, John Norris (Norris), and James Blackburn (Blackburn). Michael Sattelmaier and his brother John Sattelmaier were both actively involved in Magna Print during the years before the Court. However, the concept of the Magna Print sublimation process apparently came from Michael Sattelmaier. The sublimation process as originally promoted by Michael Sattelmaier utilized Minolta Model 101 photocopiers with a substitute lens and a liquid toner. The toner was manufactured for Magna Print *240 by Hilord Chemical Company in New York. It is unclear on this record whether the actual formula for the toner was conceived by Michael Sattelmaier or was provided to him or to Magna Print by Edward W. O'Brien (O'Brien), d/b/a Powerband Products of Virginia. 7 The replacement lens was procured from a third party. A relatively small number of Minolta Model 101 machines were purchased either new or used by Magna Print and converted by it in its offices which ultimately were in Richmond, Virginia, into sublimation process machines styled Magna Print Model 2000L which used liquid toner. Some of these machines were sold to dealers or placed in service with lessees. 8 Some of these machines were utilized by Magna Print in its Richmond offices to service drop-in trade. Magna Print at one time sought to package and sell toner, supplies, and objects on which designs would be imprinted and to allow the use of machines without cost as a way of promoting the sale of toner and supplies. This project was not successful. *241 Neither was Magna Print successful in direct sale of machines, toner, and other supplies. While apparently these machines could be persuaded to work, at least on a demonstration basis, in prolonged use by third parties, the machines required excessive maintenance and simply did not work. There were also some problems with respect to the toner, not the least of which was that it was petroleum-based and was flammable. 9 Magna Print in 1980 or 1981 made some effort to promote its products through advertising and trade shows. The record includes documents reflecting that between March and September 1981 Magna Print and its patent attorneys engaged in correspondence *242 with Spectre Corporation and its attorneys with respect to contentions that Magna Print's toner (either the liquid or the dry product) may have infringed patents owned by or licensed to Spectre Corporation. The exchange of correspondence may have commenced earlier than March and must have continued after September. During 1981, Spectre Corporation and Sublistatic Holdings, S.A. filed suit against Edward W. O'Brien in January 1983 in which an injunction and, in January 1984, a contempt order was issued. The contempt order required O'Brien to publicize the injunction and the contempt order. There is no evidence that Magna Print purchased its toner from or through O'Brien or that manufacture of the Magna Print toner violated Spectre Corporation's patent rights. However, the parties and certain witnesses seem to assume that to be the case. By the end of 1984 that part of Magna Print's business involving utilization of Minolta copiers closed. Petitioners' Magna Print Investment Each set of petitioners was introduced to this investment directly or indirectly through a Baton Rouge accountant, Norman Neyland, who operated a tax service in Baton Rouge from 1957 until sometime in 1984. *243 A substantial part of Neyland's practice consisted of introducing his clients to apparently acceptable and legitimate tax shelters. Neyland's attention was called to the Magna Print investments as a possible tax shelter by an ad in the Wall Street Journal which appeared in early 1981. The ad, among other things, suggested the possibility of deductions of $ 4 for each $ 1 invested. Neyland initially made contact with a Clyde H. Freed, Jr. (Freed) who had offices in 1981 in Alexandria, Virginia. Freed had an agency or commission-type arrangement with Magna Print, the nature of which is not determinable from this record, which allowed him for a commission to arrange sales of these machines to investors. Neyland traveled to Alexandria and during a visit of several days saw the machines, was provided samples of its product, talked to its accountant and to some of the Magna Print principals including Michael Sattelmaier the principal promoter, and his brother John Sattelmaier, and received some background information about Magna Print and the sublimation process. A printed document received from and bearing the signature of Freed described the highlights of the equipment purchase program *244 as follows: Description: The Magna Print Image Transfer System offers an inexpensive and also time saving method of manufacturing heat transfers. A modified desk top office copier utilizing specially formulated chemicals allows the user to reproduce in seconds from original art a transfer which can then be heat transferred on to metal, plastic, fabric and many other materials. With over 18,000 imprinted sportswear stores and approximately 22,000 trophy stores nationally -- a tremendous business potential exists in serving those markets as well as industrial markets.Attached to the document were printed forms of an installment sale contract with a 7-year pay out and an agreement approving Misho, Inc. (Misho) as lessee. During this visit or thereafter Neyland also received a printed copy of a letter to "Interested Purchasers" signed by John Sattelmaier. Attached to this document were a printed tax calculation made by Magna Print's accountant, a financial statement form, a promissory note form and copies of an installment sale contract form. These documents may or may not have been shown by Neyland to potential investors including petitioners. At this time or shortly thereafter *245 Freed or Magna Print agreed to pay Neyland a commission for inducing investors to purchase the Magna Print program. Neyland did not disclose his commission arrangement to any of petitioners. In the fall of 1981 Magna Print personnel arranged for a demonstration of the machines at a meeting held in Baton Rouge which was attended by several of petitioners. In October 1983 Neyland mailed to his clients a letter suggesting their consideration of the purchase and lease of "a revolutionary printing device" -- the Magna Print machine -- which yielded a three to one tax savings. We assume letters like this were sent out to his clients in 1981. Neyland personally explained and recommended the proposed investment to Day, Dauphine, and Henry. Chellappan heard about the investment from Paul Peterson (Peterson) who was then a securities broker in Baton Rouge. Peterson and his principal broker had heard about the investment from Neyland and the latter's son John Neyland. Peterson was authorized by his principal to recommend the Magna Print investment to clients. Peterson talked to someone at Magna Print about the investment but he principally relied upon Norman Neyland's recommendation *246 to his principal and John Neyland's statements on behalf of his father. Also Peterson felt some urgency since the year was drawing to a close. Peterson arranged for a meeting between Chellappan and John Neyland. Chellappan at that time was aware of attacks by the Internal Revenue Service on tax shelters and requested that Peterson ascertain whether or not the Internal Revenue Service had accepted or would accept the Magna Print investment as legitimate. Peterson inquired by telephone of an individual at the Internal Revenue Service if there was any reason why the Magna Print program could not be a "good" investment and was told that the Internal Revenue Service representative could think of no reason why it would not be. Peterson was also informed by an individual at Magna Print's office that the Internal Revenue Service had informally approved the investment. This information was communicated to Chellappan. Neyland was told by Magna Print personnel (or Freed), and repeated to petitioners that Magna Print had a patent on the process or on the toner, that there was no competition, that the basic machine was purchased from Minolta and was modified by substitution of a new lens *247 acquired in Germany, that the machines were unique and in short supply, that they had an extended useful life and that the purchase price, when compared with the price of plain paper copiers, was reasonable. Each investor received a Magna Print borchure in color describing in very general terms two Magna Print machines, model numbers 2000D and 2000L. Neyland explained a cash flow analysis made by him and predicted that the rental income would increase with inflation. The transactions, as understood by Neyland and petitioners and as reflected in the documents contemplated that each investor would sign an installment sale contract for a purchase of six machines with a down payment of $ 5,000 and a deferral balance (including interest) of $ 48,854 payable in 108 monthly installments reflected in a fully recourse promissory note. The machines would be simultaneously leased by Misho for a fixed term of 29 months. Rentals generated during that period would offset the obligations for principal, interest, and management fees. At the end of 29 months, the investors could take possession of the machines and continue the installment payments or the management company or Misho would arrange *248 for continued rental. Petitioners understood that the machines would be located in places accessible to customers throughout the country but were uncertain whether this would be handled directly by Misho or through subleases. The parties have stipulated that 48 individuals, in addition to these petitioners, entered into similar transactions. All investor transactions together would reflect sales of about 526 Magna Print machines. We find that Neyland was himself satisfied that the investment was a legitimate business proposition which would eventually produce income for the investors, as well as provide current tax benefits and he so advised investors. Each of the sets of petitioners in this case was aware of the existence of substantial tax benefits during the initial years of the investment and probably would not have made the investments without present tax benefits. Each set of investors also was interested in the possibility of the machines' producing revenue for them once the purchase price of the machines had been fully paid and probably would not have made the investment without knowledge of this fact. Although not material to our determination of the issue in this case, *249 we find that each set of petitioners had mixed motives for making their investment. We make no finding as to whether one of the motives was predominant or primary, and if so which. In 1983 a revenue agent who was investigating the Magna Print program stated to Neyland that he might be interested in investing in the program himself, that it sounded like a good program. Neyland repeated the substance of this statement to some of the investors with whom he counseled directly, including petitioners Henry and Day. Neyland at various times received other Magna Print information. Petitioners' Transactions The documents executed by petitioners Day which are typical include an installment sale contract for the purchase of six machines for $ 6,660 per machine with a down payment of $ 5,000 and a deferred payment balance of $ 48,854.84, payable in 108 monthly installments. The deferred payments are reflected by a note payable monthly. Each package includes a management agreement for a 10-year term, executed either by Magna Print Commercial Leasing Division or NES Corp, and a 29-month lease with Misho, Inc. 10 The management agreements provided an option in the investor to require repurchase *250 of the machines after either the sixth or seventh year for $ 1,500 per machine by assumption of the unpaid purchase price. The promissory note purports to be fully recourse. The package also includes a repurchase agreement by Magna Print at the option of the investor at the end of the 29-month lease for the balance of the purchase price. The record includes repurchase options at 29 months for Day and Dauphine. We assume the Chellappan and Henry transactions include such documents. The cash flow analysis prepared by Neyland, one or more of which were delivered to each set of petitioners assumes such an option. Each of the sets of petitioners signed personal financial statements which were transmitted to Magna Print and each received statements from Magna Print periodically at least through December 1984. Chronologically, Dauphine made the first purchase in June 1981 of six machines. 11 On October 1, 1981, Day purchased 36 machines in groups of 6. The Henry purchase was made in the fall of 1983 and the Chellappan purchase in December 1983, in each case one unit of six machines. The *251 machines were expected to be paid for by rentals in about 7 years, after which the investors would receive the cash flow. None of petitioners had had any experience with equipment leasing investments (except for a solar panel shelter acquired by Dauphine in 1980). None had had experience with machines similar to the 2000L machine but most of petitioners had some familiarity with ordinary copy machines and with their cost. The purchase price of standard copy machines was roughly comparable to the purchase price paid by each set of petitioners for the Magna Print machines. 11At the time of his investment, Dauphine was driving a truck for an oil company, having retired from the United States Army. His adjusted gross income for 1981 before depreciation on his Magna Print was over $ 30,000. Day in 1981 was employed by a manufacturer of lawn and garden equipment. His 1981 adjusted gross income before depreciation was more than $ 70,000. Henry prior to 1983 had retired from Ethyl Corporation. *252 His 1983 adjusted gross income prior to depreciation was approximately $ 43,000. In 1983 Chellappan was employed by Allied Corporation at a salary of approximately $ 45,000 and he reported interest income of $ 5,000. Operation of the Shelter The actual operation of this shelter, as explained by its promoters, principally Michael Sattelmaier but to some extent confirmed by John Sattelmaier, Norris, and John Ecimovic (Ecimovic), a cousin of Michael Sattelmaier, is essential to an understanding of this case and our disposition of it, even though we believe and find that in fact the operation was largely paper shuffling. Michael Sattelmaier as a witness was verbose, evasive and adept at lengthy incomprehensible answers to simple questions. 12 His testimony was to some extent contradicted by himself and to a large extent contradicted by the testimony of other witnesses and by objective facts. We find none of his testimony credible except to the extent that he may have correctly explained the origin of Magna Print as described under the heading Magna Print Background. To the extent that John Sattelmaier, Norris and Ecimovic appear to confirm Michael Sattelmaier's story, the confirmation *253 applied only to some of the window dressing carefully planned and planted by Michael Sattelmaier. Norris who was one of the five original stockholders in Magna Print acquired at some point from Michael Sattelmaier the stock of NES Leasing Co. and became its president. His theoretical function was to solicit users of the machines, to do reconditioning and repair, and to provide service for machines in the field which was done simply by obtaining published lists of Minolta service dealers throughout the country. Ecimovic became president of Misho, Inc. Both Norris and Ecimovic simply signed whatever documents they were requested *254 by Michael Sattelmaier to sign. In addition Ecimovic had some connection with a corporation called CCI Inc. and drew checks on that corporation's bank account as directed. John Sattelmaier became president of Magna Print but again he acted as a puppet of his brother. As a mechanism for effecting the sale of Magna Print machines, toner, and supplies, Michael Sattelmaier testified that he arranged with certain foreign lenders whose identity and location he did not know or could not remember, but who were already engaged in financing joint ventures, to work with Magna Print under the name CCI. 13 CCI operated through an individual by the name of Larry Pinder (Pinder), apparently a resident of Nassau, Bahamas, who was acting as a commercial agent for CCI. Michael Sattelmaier also testified that he had some dealings with a Bahamian lawyer by the name of Trenshaw. 14As explained by Michael Sattelmaier these unidentified *255 lenders acting through Pinder as their commercial agent insisted on using what Michael Sattelmaier described as a "OEM" agreement. Pursuant thereto CCI undertook that upon approval of the credit of installment sale purchasers it would acquire the Minolta machines sold to investors, cause them to be modified into Model 2000L sublimation process machines, procure independently the toner and supplies, using the secret formual supplied by Michael Sattelmaier, 15 develop sublessees to utilize the machines scattered throughout the United States from names furnished to it by NES Leasing, Inc. or Misho, Inc. or presumably otherwise located. When CCI approved the credit of an investor such as the four sets of petitioners, the machine would be acquired and placed in the field. CCI then periodically supplied NES Leasing or Misho with rental statements and information as to the identity and location of the actual users. The purchasers were to be furnished with statements showing rentals received. In order to prevent Magna Print from itself supplying toner and supplies to the users in the field, thus cutting CCI out of its profit from the supplies, Magna Print was required to be isolated from *256 the identity of the users of the machines. It was for this reason that Michael Sattelmaier was directed by the lenders to set up NES Leasing and Misho. The alleged OEM agreement also provided for a periodic audit of Magna Print, NES Leasing, and Misho. The notification to Magna Print that Spectre had won its patent infringement suit and that all parties formerly dealing with O'Brien were ordered to cease and desist from violating the patents pertaining to the toner triggered an audit by Pinder. He, as the commercial agent of CCI, came to Richmond and took physical possession of all of Magna Print's books and records and all of the books and records of Misho and NES Leasing, physically transporting these records to Nassau. The records thus became unavailable to Michael Sattelmaier, Magna Print, Norris, and the Ecimovic, and of course to the parties and the Court. Notwithstanding the audit and removal of records, Michael Sattelmaier, who previously had purported to sever his relationship with Magna Print, resumed active but unofficial management. He, therefore, *257 caused John Sattelmaier as president of Magna Print to send letters 16 to most of the investors, including petitioners, which notified the purchasers of the patent infringement situation, stated that the lessee would not renew upon expiration of the 29-month lease, and offered three options: (1) to accept delivery of the machines and continue the monthly payments, (2) to pay $ 438 per machine to Magna Print for converting the equipment to a coin operated paper copier and to keep the equipment leased until the purchase price was fully paid 17*258 and (3) to cancel the purchase and forfeit the down payment. The investors' notes were transferred to or were seized by Pinder during the audit and, so Michael Sattelmaier testified, CCI intended to enforce payment of the notes. Facts With Respect to Investor Transactions We find that the elaborate program outlined by Michael Sattelmaier for the handling of the installment sales of machines, including financing, procurement, and placing of sublimation process machines with users in the field by or through foreign lenders operating under the name of CCI through the agency of one Larry Pinder in the Bahamas was a pure figment of the imagination of Michael Sattelmaier and perhaps certain of his business associates including certainly John Sattelmaier, Norris, Blackburn, and probably Pinder. Michael Sattelmaier took Ecimovic to Nassau where the latter met Pinder and found some Minolta machines in a warehouse ostensibly leased by Pinder. Pinder also appeared at Magna Print's business office in Richmond on several occasions. He was described as a bodyguard for Michael Sattelmaier. We doubt that Ecimovic was a party to the sham; rather he was simply a convenient tool who did what he was told without question. 18 As part of the window dressing, there was a Bahamian company under the name of C.C.I. Leasing Limited which *259 Ecimovic used in establishing an account at United Virginia Bank. 19 There was also a post office box in Washington, D.C., or a neighboring area at which mail addressed to CCI could be received. Whether there was any actual use of that mailbox we cannot determine. We infer that Michael Sattelmaier through Magna Print may have originally commenced a legitimate business endeavor to convert Minolta Model 101's to the sublimation process and some of these machines were sold to third parties, some placed in business locations either by Magna Print directly or through leases or sales. Magna Print may also have converted and sold a few coin-operated photocopy *260 machines. At least there were several in the Richmond area at one time but there is no definitive proof that these were sourced from Magna Print. Magna Print also purchased in June 1984 from Graphic Enterprises in Canton, Ohio, 121 Minolta Model 101 copiers which were warehoused in the Richmond, Viriginia, area. A few of these copiers had Magna Print 2000L labels put on the front of the machine and a silver sticker with a serial number on it placed on the back of the machine. Some of these serial numbers correspond to the serial numbers of machines allegedly sold to investors. None of the installment sale contracts in this record contain serial numbers but the monthly statements which were furnished to these petitioners do have serial numbers thereon. There is no evidence of the existence of Magna Print serial number labels earlier than 1984. Day elected this conversion option and paid the conversion fee in full. The last statement he received was one dated in December 1984. Chellappan and Henry also elected the conversion option, paid the additional fees and received Statements through December 1984. Dauphine ignored the correspondence. The conversion fees were received and *261 retained by Magna Print but no machines were ever converted. The fees were used by Magna Print for operating purposes. The sublimation process business which Magna Print carried on ceased in 1984 although certain related businesses involving the sales of standard copy machines and other office equipment and supplies continued thereafter. 20*262 We further find that these monthly statements were generated by Magna Print in Richmond by Norris and another Magna Print employee, Blackburn. Cards similar to the monthly statements were kept at one time in a box on the secretary's desk in the Richmond offices. Thereafter they were apparently transferred to Washington. Periodically, Norris and Blackburn took the account cards into the conference room and apparently according to some sort of a formula made entries on each. On these occasions they had no source of information before them. The alleged computer printout furnished by CCI to Norris was simply not in existence. These monthly statements were clearly part of the fabricated sham. We surmise that when Michael Sattelmaier became convinced that there were too many mechanical problems with the converted Minolta sublimation process machines to make them practicable, and perhaps because of concern as to flammability of the toner, *263 he set up the purported tax shelter as a means of profiting from his unworkable concept. In the process he defrauded the tax shelter investors including all of petitioners. We are convinced that the machines which Magna Print released to Neyland in 1984 were simply removed from Magna Print's warehouse and had the serial numbers affixed to match the serial numbers requested by Neyland (at the instance of one of respondent's agents). These machines had never been in actual service pursuant to the installment sales -- lease obligations. We further surmise that the threat of Internal Revenue Service investigation in 1984 caused the termination of the installment sales contract arrangements with the books and records simply disappearing, theoretically to the Bahamas, in an effort to conceal the fraud. OPINION We agree with respondent that the transactions between petitioners and Magna Print, and presumably the additional 45 to 50 other investors who entered into similar transactions but whose cases are not before the Court, simply did not take place. An installment sale of the type reflected in the documents in this case is simply a sale with deferred payments and frequently with *264 the title reserved by the seller as security. The term "sale" is generally defined as a transfer of property for money or promise to pay money. Commissioner v. Brown,380 U.S 563, 570-571 (1965). Generally, in deciding whether a transaction constitutes a sale, we look at whether the benefits and burdens of ownership have passed from seller to buyer. But such an analysis contemplates the existence of the property purporting to be sold. There can be no sale when the property purporting to be sold is not in existence, is not intended to be in existence, and the transaction in reality is a fraud perpetrated by the seller upon the buyer, which is these cases. We necessarily find for respondent with respect to the deficiencies. We do not need to reach the question as to whether there was any business purpose for the transaction or whether the transaction had economic substance and of course the question of the value of the machines is also irrelevant. Similarly those investors who made additional payments ostensibly to cover the cost of converting the sublimation process machines to coin-operated photocopiers are not entitled to additional investment tax credits and depreciation deductions. *265 There were no conversions of investor-owned machines to coin operation. This was simply another part of the fraudulent scheme. Additions to Tax Due to Negligence Respondent argues that the negligence addition should be upheld simply because the taxpayers lacked business purpose, characterizing these transactions as an abusive tax shelter. The scarcity of the information available regarding economic feasibility should have prompted a full investigation by each of petitioners; none of them hand any personal experience with the equipment purchased. Respondent also points out that petitioners failed to make any investigations prior to investment or obtain independent information. Respondent, however, ignores several factors which we deem to be pertinent. Each of petitioners was informed by Neyland or his son that these machines were unique and that they were patented. At least some of petitioners were informed also that the Internal Revenue Service had apparently looked at this shelter and found it legitimate. Finally, petitioners as well as Neyland were in general aware of the cost of ordinary office copy machine equipment and the cost of these machines was not disproportionately *266 higher than first class copy machine equipment. We conclude that under the somewhat unique circumstances of this case, petitioners were entitled to rely upon the representations made to them by Neyland and in the case of Chellappan by Peterson. They had seen the equipment demonstrated and they had no reason to suspect that the scheme was fraudulent. There is no basis on this record for imposing the addition to tax for negligence under section 6653(a)(1) and (2) upon any of petitioners. Additions to Tax Under Section 6659Section 6659 is applicable to underpayments of tax which are attributable to valuation overstatements. Respondent argues that petitioners reported their adjusted basis in the Magna Print machines at their cost, including the recourse note of approximately $ 6,500 per machine whereas, according to respondent, the evidence establishes that the machines were valueless. Therefore, respondent argues, the value exceeded 250 percent of the correct value. In partial support of respondent's position, respondent points out that Magna Print's May 1, 1981, authorized dealer price schedule shows a retail list price of $ 4,995 for the Model 2000L machine. The opinions of *267 respondent's experts are essentially based on their understanding that the machines had mechanical defects which prevented them as a practical matter from working in the kind of use to which they were intended to be placed. While there is much to be said in support of the opinions of these experts that a machine which will not work is practically valueless, we find expert testimony to be irrelevant in this case for the simple reason that there are in fact no machines actually sold to these petitioners. We are not here concerned with a determination of the actual value of an existent item of personal property; rather our concern is with the tax consequences of a proposed sale which did not in fact occur. Respondent appears to rely principally on decisions of this Court such as Secoy v. Commissioner,T.C. Memo. 1987-286, and McCain v. Commissioner,T.C. Memo. 1987-285. These opinions concern generic tax shelters such as we described in Rose v. Commissioner,88 T.C. 386 (1987). Although we recognized in Secoy v. Commissioner, supra, the possibility of defects in title, the significant point is that in each of these cases the property which petitioners intended to acquire and which *268 was reported on their tax returns at inflated values was in existence. As we noted petitioners acquired what they paid for, which was essentially tax benefits. Under such circumstances, we concluded in Zirker v. Commissioner,87 T.C. 970 (1986), that application of the section 6659 addition was appropriate. We measured this addition by the difference between the value reported on petitioners' tax returns and zero since we had found that the transactions lacked economic substance and were not to be recognized for tax purposes. Petitioners on the other hand distinguish Zirker v. Commissioner, supra, and instead rely upon Todd v. Commissioner,89 T.C. 912 (1987). In Todd, we found that petitioners had purchased food containers on December 8, 1981, and on October 14, 1982, but without their knowledge the containers were not released to the Todds or placed in service prior to 1983. We noted in Todd that depreciation deductions and investment tax credits are not available to a taxpayer prior to the time the property is placed in service. The question of basis is entirely independent of the question as to whether an item of property has been placed in service. In Todd we distinguished *269 Zirker and its progeny because until an item of property is placed in service and investment tax credit and depreciation deductions become available, we simply do not reach the question of value or the determination of whether or not there was a valuation overstatement. As we noted in Todd v. Commissioner, supra at 918. The consequence of determining that an asset was not placed in service during the years in issue is to disallow all deductions and investment tax credit relating to that asset. In many cases, presumably including this one, such deductions and credits will be allowable in a later year. To the extent that deductions in a later year are based on the valuation overstatement, they will be subject to the additions to tax under section 6659. * * *Similarly, we need not reach the question of value or the issue of a valuation overstatement when there is no asset in respect of which such a determination must be made. In Todd we rejected respondent's argument that the addition under section 6659 is applicable whenever an underpayment is attributable to a transaction involving or accompanied by a valuation overstatement. Noting that the legislative history to section 665921*270 was rather sparse, 22 we quoted with approval the General Explanation by the Staff of the Joint Committee on Taxation which stated that "the portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability." 89 T.C. at 916. Accordingly, we recognized from deciding a case on one issue that leads to disallowance of all deductions and credits merely because deciding another issue would bring into play an addition to tax." 89 T.C. at 920. Also in Todd, we pointed out the similarity between section 6659 and section 6621(c)23 and respondent's temporary regulations 24 promulgated under the latter. As there noted the similarity between the method of computation of an underpayment attributable to a valuation overstatement under section 6659 as described by the *271 Joint Committee's General Explanation, and the computation of an underpayment attributable to a tax-motivated transaction under section 6621(c) as described in respondent's temporary regulations, is too great to be overlooked. In both cases the amounts subject to the respective additions are computed by determining the taxpayer's correct tax liability and subtracting from that the taxpayer's liability taking into account all adjustments other than those attributable to valuation overstatements or tax-motivated transactions, as the case may be. The resulting difference is the underpayment subject to the addition or additional interest. These directives would have little substance if, when determining the amounts of underpayment other than those attributable to a valuation overstatement or tax-motivated transaction, we did not take into consideration all of the proper adjustments except those attributable to those infirmities. For a taxpayer to be entitled to a *272 deduction for depreciation, he must make an investment or have an interest in depreciable property. As we stated in Hunter v. Commissioner,46 T.C. 477, 489-490 (1966)It is axiomatic that to be entitled to depreciation under section 167 the taxpayer must have an investment in the property sought to be depreciated, [citation omitted] and that the investment must be of such a character as to give the taxpayer a depreciable interest in the property. * * *In the text of section 6621(c), we stated in Law v. Commissioner,84 T.C. 985, 993 (1985), that If we were to find that the partnership did not in fact acquire a depreciable interest in the film, we would not have to decide whether the film was overvalued in order to determine that the partnership was not entitled to a depreciation deduction. * * *This language is directly on point here. Because there was no asset, petitioners acquired no depreciable interest in any property, and any statement of value or adjusted basis claimed on any return is irrelevant to the disallowance of the depreciation deduction and investment tax credit. 25 Once these "proper adjustments" are taken into account, there is no difference between petitioners' *273 correct tax liability and petitioners' tax liability before making an adjustment for any valuation overstatement. This is not a case, as in Zirker v. Commissioner,87 T.C. 970 (1986), of an asset in which petitioners had a zero basis, but is rather a case in which petitioners had no asset in which to have a basis. Zirker stands for the proposition that where there is no sale because a transaction lacks economic substance, the taxpayer takes a zero basis in the asset sought to be depreciated and a valuation overstatement automatically follows. Zirker v. Commissioner, supra at 977-979. See also Rose v. Commissioner,88 T.C. 386, 426 (1987). 26 However, as noted above, we make no finding regarding this transaction's economic substance; the transaction was simply a fraud perpetrated upon petitioners and their fellow investors. Likewise, we make no finding regarding whether the benefits and burdens of ownership passed to petitioners; *274 there were simply no benefits and burdens to pass. In the instant case as in Todd the machines which petitioners thought they were buying were not placed in service during any of the years before the Court. However, unlike Todd, the reason the machines were not placed in service is their nonexistence. It is for this reason that petitioners are not entitled to investment tax credits and depreciation deductions. Thus, for purposes of section 6659, we do not reach the valuation question. Although respondent argues that these machines were valueless, respondent's testimony in fact shows that the machines, had they been in existence, would have had salvage value. One purchaser of machines in fact finally gave up trying to make the machines work and sold them for a salvage value of $ 5 each. But as we have already pointed out, there is simply no way in which anyone can value nonexistent property and no need to do so. A person cannot acquire basis in nonexistent property and there is no way in which one can compute the difference between actual value and basis. Accordingly, we hold *275 that the addition to tax under section 6659 is not applicable to any of petitioners. Addition to Tax Under Section 6621(c)As we held in Patin v. Commissioner,88 T.C. 1086 (1987), Congress specifically added to the list of tax-motivated transactions for purposes of this addition any sham or fraudulent transaction. See also Cherin v. Commissioner,89 T.C. 986, 1000 (1987). Since we found that these transactions were factual shams, they are tax-motivated transactions within the meaning of section 6621(c). The addition to tax under this section is applicable. Decisions will be entered under Rule 155.Footnotes1. Sellamuthu G. Chellappan and Hilda J. Chellappan, docket No. 1514-86; William G. and Reba C. Day, docket No. 8910-86; Lawrence Dauphine and Sybil Dauphine, docket No. 25731-86; and Tupie C. Henry and Isabel B. Henry, docket No. 5103-87 were consolidated for purposes of trial, briefing, and opinion on June 4. 1987. ↩2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩3. Additions under section 6621(c)↩ are asserted by respondent in Amendments to Answer in Docket Nos. 1514-86 and 8910-86.*. Interest is to be computed under section 6621(c)↩, formerly 6621(d). 3. Additions under section 6621(c)↩ are asserted by respondent in Amendments to Answer in Docket Nos. 1514-86 annd 8910-86.*. 120% of interest on $ 770.00 for 1979, on $ 5,215.00 for 1981, and on $ 515.00 for 1982, assessed after December 31, 1984. 4. By amendment to answer respondent seeks to increase the rate for this addition from 10 percent to 30 percent, increasing the amount of the addition to $ 1,564.50.↩*. 120% of interest due on $ 9,240.00 for 1983 and on $ 3,277 for 1984, assessd after December 31,1984. ↩5. Petitioners' Day 1978 year and petitioners' Dauphine 1979 year involve carryback losses arising out of these investments. ↩6. For convenience, in our opinion we describe the transactions as outlined in the transaction documents which were presented to and executed by the several petitioners without repeatedly using a word such as "alleged." We intend no implication that any one of the machines thought to be purchased by each set of petitioners from Magna Print actually existed or was placed in service for the account of any one of the four sets of petitioners. We will also for convenience refer to each set of petitioners collectively by their last name. In some instances the wives appear to have played no active part in these investments and in other instances appear to have been actively involved but it is unnecessary to focus on how the respective spouses related to each other with respect to these investments. 7. Michael Sattelmaier claimed credit for the toner formula which was used in the Magna Print machines, contending that the formula was not patented but was treated as a trade secret. ↩8. A business in Texas purchased 50 machines on the understanding that it would have as its exclusive territory the State of Texas. The machines would not work satisfactorily and were finally sold as junk for $ 5 each. ↩9. In at least one incident a truck pulling a trailer carrying a load of machines and toner was in a rear-end accident in which a tractor trailer apparently crushed the Magna Print trailer. A fire ensued which Magna Print personnel thought may have been attributable in part to the flammability of the toner. ↩10. The Day 29-month lease is signed by John Ecimovic although the name Misho, Inc. does not appear. ↩11. The package originally bought by Dauphine was composed of 10 machines but that was changed to 6 with Dauphine entering into amendatory agreements reducing the number of machines from 10 to 6. ↩12. As an example, at the beginning of transcript page 404, respondent's counsel inquired whether CCI, CCI Inc., and CCI Leasing, Inc. were names for the same or different entities. The resulting colloquy continued to page 408 without an answer to the question. At that point the Court undertook to obtain an answer to this question. Finally at page 412, the Court stated to respondent's counsel: THE COURT: I apologize for interrupting, Ms. Helfgott. I thought that maybe I could get a straight answer out of the witness, but apparently I can't. You may proceed. ↩13. CCI stands for Consolidated Creditors International. ↩14. Stipulated documents with respect to a Bahamian corporation by the name of C.C.I. Leasing Limited refer to an Edith L. Turnquest who is described in one of the documents as an attorney for C.C.I. Leasing Limited. ↩15. Michael Sattelmaier did not require any agreement from CCI to protect the toner formula -- his "valuable" trade secret. ↩16. There were three versions of these letters. Day and Dauphine recieved identical letters dated September 10, 1984. Chellappan received an undated letter, apparently mailed in December 1984, and Henry received a letter dated April 24, 1985. ↩17. This option also provided that the conversion cost could be paid in full or paid one-half with exercise of the option and the balance in installments. Payments on the notes were not required during the conversion process or at any time when the machines were not rented. 18. Apparently Sattelmaier and Pinder had or sought other business interests in the Bahamas and took some part in political campaigns, none of which had anything to do with the alleged installment sales of machines to petitioners and other investors. ↩19. We note that the signature card for this account also has as part of the title the name CCI Inc. This individual also established an account in the name of C.C.I. Inc. at Bank of Virginia. Whether in fact there ever was a legal entity under this name we cannot determine from this record. ↩20. There is a conflict in this record as to whether in March 1984 CCI took possession of and removed only Magna Print's books and records or Magna Print's assets as well. Michael Sattelmaier testified that the books and records were removed. His affidavit filed in a summons enforcement proceeding in the United States District Court in 1986 is to the same effect. However, affidavits filed in the proceeding by John Sattelmaier and James E. Blackburn both state that assets and records were removed by the lender. In his testimony John Sattelmaier first testified that books and records were removed but then changed his statement to conform to the affidavit. However, the draft OEM agreement introduced into evidence through Michael Sattelmaier and described as substantially identical with the actual Magna Print -- CCI agreement does not authorize seizure of any tangible personal property such as furniture, fixtures, or machines. We are inclined to believe that the word "assets" as used in the affidavits should be understood to refer to the items defined in the OEM agreement as "collateral." 21. Section 6659↩ was originally enacted as part of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 341. 22. "The addition to tax applies only to the extent of any income tax underpayment which is attributable to such [a valuation] overstatement * * *." H. Rept. 97-215 (Conf.) at 262 (1982), 1981-2 C.B. 481↩, 515. 23. Section 6621(d) was redesignated section 6621(c)↩ by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. 24. See section 301.6621-2T, A-5, Proced. and Admin. Regs. (Temporary), 49 Fed. Reg. 59394↩ (Dec. 28, 1984). 25. Because the investment tax credit is premised upon an investment in section 38 property and our finding that there was no property here in which petitioners made an investment, our discussion regarding depreciation is equally applicable to the investment credit. ↩26. See also Avers v. Commissioner,T.C. Memo. 1988-176; Secoy v. Commissioner,T.C. Memo. 1987-286↩.